Chicago, Wilmington and Vermilion Coal Co. *et al.*

*v.*

The People of the State of Illinois.

*Opinion filed February 21, 1905—Rehearing denied April 5, 1905.*

1. Conspiracy—*when indictment charges conspiracy at common law.* An indictment against corporations engaged in mining coal, charging them with conspiracy and that the object of the conspiracy was unlawful, sufficiently charges conspiracy at common law, without setting out the means whereby the conspiracy was to be accomplished; nor is it necessary that the object of the conspiracy constitute an offense against the criminal law, for which an individual might be indicted and convicted.

2. Same—*combination to prevent competition in sale of coal is a common law conspiracy.* A combination between independent producers of coal to prevent competition in its sale is inimical to trade and commerce, detrimental to the public and unlawful, and amounts to a common law conspiracy, regardless of what may be done in furtherance of the conspiracy.

3. Same—*common law as to regulating and fixing prices is in force in Illinois.* The common law upon the subject of regulating and fixing prices of a commodity has not been abrogated in Illinois by the adoption of sections 46 and 130 of the Criminal Code, relating, respectively, to conspiracy to do an illegal act and to influencing or attempting to influence the price of a commodity or to corner the market therefor.

4. Same—*section 46 of Criminal Code not repealed by Anti-trust act of 1891.* Section 46 of the Criminal Code, in so far as it relates to a conspiracy to do an illegal act injurious to the public trade or to prevent competition, was not repealed by the Anti-trust act of 1891, since the gist of the offense under section 46 is the conspiracy to do the act, whereas the offense under the act of 1891 is the doing of the act itself.

5. Trusts and combines—*Anti-trust act not limited to corporations organized to transact business in this State.* A corporation doing business in Illinois is amenable to the Anti-trust act of 1891 for violation thereof, regardless of where the corporation was organized or whether it was organized "for transacting or conducting any kind of business in this State."

6. Same—*one violating Anti-trust act may be prosecuted by indictment.* Under section 1 of the Anti-trust act of 1891, (Laws of 1891, p. 207,) in case of violation of the provisions of the act the

State may prosecute by indictment, or under the provisions of section 7 may bring an action of debt to recover the fine imposed by the act.

7. Same—*absolute monopoly not essential to unlawful combination.* The fact that a combination to fix the price of a commodity and prevent competition among members of the combination does not give the association a complete monopoly of the trade in the territory in which the members of the association transact business does not relieve the members from criminal responsibility in forming the combination.

8. Same—*fact that the association is voluntary does not relieve members from legal effect of their acts.* The fact that an association having for one of its objects an act which is illegal and against public policy is a voluntary organization, having no written articles of association, does not relieve the members thereof from the legal effect of their acts, and as soon as the unlawful combination is formed all members are bound by the acts of the others in furthering the objects of the combination.

9. Same—*defense cannot be predicated upon unconstitutional law.* Defense to an action against coal mining corporations for a violation of the Anti-trust act of 1891 cannot be predicated upon the proviso to section 1 of that act, added in 1897, (Laws of 1897, p. 298,) since such proviso is unconstitutional, and no right can be predicated upon an unconstitutional law.

10. Indictment—*when an indictment for conspiracy sufficiently charges an illegal intent.* An indictment under section 46 of the Criminal Code, charging that the defendant corporations unlawfully, fraudulently, maliciously, wrongfully and wickedly conspired and agreed together to do an illegal act, in effect charges the conspiracy to have been formed with a fraudulent or malicious intent to wrongfully and wickedly do an illegal act.

11. Propositions of law—*section 42 of Practice act does not apply to criminal case tried without jury.* Section 42 of the Practice act, relating to propositions of law, does not apply to the trial of a criminal case without a jury, particularly where all questions of law are properly preserved for review by motion to quash, motion to exclude the evidence and motions for new trial and in arrest of judgment.

Writ of Error to the Appellate Court for the First District;—heard in that court on writ of error to the Criminal Court of Cook county; the Hon. O. H. Horton, Judge, presiding.

On January 19, 1903, a special grand jury returned into the criminal court of Cook county an indictment, containing five counts, against the corporations named as plaintiffs in error, charging said corporations with having entered into a conspiracy to do an illegal act injurious to the public trade and with entering into and being parties to a pool or combination, the object of said conspiracy and combination being to regulate and fix the price at which coal should be sold in the State of Illinois.

The first count of the indictment is based upon section 46 of the Criminal Code, and omitting the formal part is as follows: "Unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to-wit, to then and there, in restraint of trade and to the injury of the public trade, unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other wrongfully to regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, to the great damage and injury of all purchasers of said coal, and contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

The second count is in the same language as the first, except it concludes "contrary to the law."

The third count is also based upon section 46 of the Criminal Code, and is as follows: "Unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree together to do an illegal act injurious to the public trade, to-wit, to then and there, in restraint of trade and to the injury of the public trade, unlawfully regulate and fix the price at which coal should be sold in the said State of Illinois, which said coal was then and there an article of

necessity to the said public and consumers thereof in the said State of Illinois, said coal being then and there a commodity and article of merchandise, contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

The fourth count is in the same language as the third, except it concludes "contrary to the law;" and the fifth count is based upon section 1 of the Anti-trust law of 1901, and is as follows: "Being then and there engaged in or interested in the business of selling coal to the general public and to consumers of said coal, did then and there wickedly and unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other then and there to unlawfully regulate and fix the price at which coal should be sold in the State of Illinois, which said coal was to be thereafter mined, produced and sold in the State of Illinois, and was then and there an article of necessity to the said public and consumers thereof in the said State of Illinois, said coal being then and there a commodity and article of merchandise, whereby, and by force of the statute in such case made and provided, the said defendants, and each of them, are deemed and adjudged to be guilty of a conspiracy to defraud, contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

The plaintiffs in error filed a motion to quash the indictment, and each count thereof, which motion was overruled, whereupon they entered a plea of not guilty. A jury was waived by agreement and the case was submitted to the court upon the following agreed statement of facts:

"(1) That the Northern Illinois Soft Coal Association is a voluntary association, which was formed and organized about fifteen or twenty years ago, then composed of various corporations and individuals engaged in the business of operating in and mining soft coal in the northern part of the State of Illinois.

"(2) That said association has been in existence from the date of the formation thereof to the present time, and assumed the name and style aforesaid in the year 1897.

"(3) That at the first meeting thereof one A. L. Sweet, then an officer of the Chicago, Wilmington and Vermilion Coal Company, one of the defendants herein, was chosen and acted as president of said meeting, and one Edward T. Bent, an authorized representative of the Oglesby Coal Company, one of the defendants herein, was chosen and acted as secretary of said meeting; that at said meeting there were various authorized representatives of different coal companies then operating in and mining soft coal in the northern part of said State of Illinois, including some of the defendant companies herein, and that various meetings of said association have been held since the formation thereof, up to and including December 13, 1902, at most of which said A. L. Sweet has acted as the president and presiding officer thereof and said Bent as the secretary thereof, each of whom was duly authorized to act at said association meetings for said Chicago, Wilmington and Vermilion Coal Company and the said Oglesby Coal Company, respectively.

"(4) That said association has never adopted any constitution, by-laws or provisions for penalties or terms of admission to or expulsion from said association; that the several defendant companies, through their authorized representatives, have from time to time held meetings, which were called by said Bent, as secretary of said association, and that all of said meetings have, since some time in the year 1897, been held in Chicago, in the county of Cook and State of Illinois, and that assessments for routine expenses were levied and paid upon and by said companies, the last being levied and paid September 20, 1902.

"(5) That at said meetings discussions were had and resolutions passed respecting the subject of wages, transportation and prices at which the several defendant companies and others there represented, as aforesaid, should sell the

coal so mined by them on the market to consumers thereof, in the State of Illinois and elsewhere; that between July 1, 1891, and July 1, 1897, no action was taken by said association at its said meetings with respect to prices of said coal.

"(6) That during the existence of said association the said Edward T. Bent has acted as the secretary of said association, and as such has called said meetings by sending notices thereof to the defendant companies and other coal mining companies so operating in and mining coal in northern Illinois, and that after each meeting, with a few exceptions, he has transmitted to each of the defendant companies, and said other coal mining companies, copies of the proceedings had at said meeting.

"(7) That at a meeting of said association held in Chicago, aforesaid, March 26, 1900, the following resolution was adopted and a copy thereof transmitted to the defendant companies and said other coal mining companies represented in said association, as aforesaid, to-wit:

" 'Northern Illinois Soft Coal Association.

" 'Chicago, Ill., *March 26, 1900.*

" 'Dear Sir—At meeting of this association held this day the following were unanimously adopted:

" '*Resolved,* That the price on mine run coal be ten (10) cents per ton less than on standard lump; that when coal is sold through jobbers, the shipping company shall see that full circular prices are maintained by said jobbers; that the maximum commission to jobbers shall be ten (10) cents per ton; that no factory or steam coal shall be sold through jobbers or local dealers at less than established prices thereupon, except to parties or at points fully approved and listed; that no firms shall be recognized as line men except as duly approved and listed; that no coal shall be sold to listed line men except direct and without commission to any jobber; that no coal shall be sold to line men at a fixed price for any specified time, and that listed line men may be sold from time to time at ten (10) cents per ton less than existing circular prices.

" '*Resolved,* That until further action of the association, the circular price to dealers be $2.15 for standard lump and $2.25 for chunks at mines.

" 'A committee consisting of Messrs. Booth, Lemmon and Bent was appointed to prepare a list of points at which selling factory or steam coal through local dealers is permissible and the dealers en-

titled to a commission thereupon, and an official list of line men entitled to a ten (10) cents per ton commission from circular prices. Please send at once to one of the members of the committee a list of the points (such as Rockford and Freeport) where you consider it necessary to sell steam and factory coal through dealers, and what dealers at such points you understand should properly participate in this business, and also a list of line men ('elevator' and 'lumber') who, and who only, in your view, should get ten (10) cents concession from established circular prices.

" 'The desire is to restrict these concessions to the utmost extent practicable, so please drop all names possible. The list finally compiled will be uniform throughout the northern field, so that no company's interests will be prejudiced.

" 'Yours truly,

E. T. Bent, *Sec'y.'*

"(8) That following a meeting of said association called as aforesaid, and held in Chicago September 26, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said association, as aforesaid:

" 'Northern Illinois Soft Coal Association.

" 'Chicago, Ill., *Sept. 26, 1902.*

" 'Dear Sir—At a meeting held this day the following was unanimously adopted:

" '*Resolved,* That prices of association coal, including steam and all other business, except on such continuous sales as are legally or morally binding, effective October 1, 1902, and subject to change without notice, (quotations to be made September 29, 1902,) shall be as follows:

Ottawa:
    Third vein standard lump....................$2.90 delivered
    Chunks......... ............... ...... ...... 3.00     "
    Streator and Cardiff standard lump......... .. 2.80     "

Joliet:
    Third vein and Wilmington standard lump..... 2.80     "
    Chunks................... .... ..... ....... .. 2.90     "

Streator:
    Standard lump........ ............... ........ 2.70     "
    Chunks..................... ........ .. .... 2.80     "

Lemont and Lockport:
    Standard lump................. .......... .... 2.40 at mines
    Chunks........ ....... ..... ............. 2.50     "

Chicago:
    Wilmington (no switching)..................$2.75 delivered
    Third vein and Streator....................Open
Rockford and Freeport:
    Standard lump...............................  2.95  "
    Chunks......................................  3.05  "
Galena:
    Standard lump...............................  3.40  "
    Chunks......................................  3.50  "
Dixon:
    Standard lump...............................  2.90  "
    Chunks......................................  3.00  "
Davenport, Rock Island, Moline, Chicago Heights,
    St. Paul, Minneapolis, Milwaukee and Ft. Mad-
    ison.................................................Open
Clinton, Lyons and Fulton:
    Standard lump...............................  3.25  "
    Chunks......................................  3.35  "
Mendota and Amboy:
    Standard lump...............................  2.80  "
    Chunks......................................  2.90  "
Lostant:
    Third vein and Wilmington standard lump.....  2.75  "
    Streator and Cardiff standard lump..........  2.60  "
    Chunks......................................  2.70  "
Rochelle and Malta:
    Standard lump...............................  3.20  "
    Chunks......................................  3.30  "
Sterling and Rockford Falls:
    Standard lump...............................  3.00  "
    Chunks......................................  3.10  "
Aurora:
    Standard lump...............................  3.00  "
    Chunks......................................  3.10  "
Batavia, DeKalb, Sycamore, Waukegan, St. Charles
    and Geneva:
    Standard lump...............................  3.00  "
    Chunks......................................  3.10  "
Elgin, Earlville and West Chicago:
    Standard lump...............................  3.05  "
    Chunks......................................  3.15  "
Belvidere:
    Standard lump...............................  3.15  "
    Chunks......................................  3.25  "

Alton:
    Standard lump.................... ......... ......$2.40 at mines
    Chunks............... ......... ............ 2.50   "
LaCrosse:
    Standard lump......... ............... ...... 2.40   "
    Chunks............... ......... ............ 2.50   "
West Chicago to Belvidere, not inclusive and not in-
    cluding Elgin:
    Standard lump.......... .............. .. 2.40   "
    Chunks.....·...... ......... ............ 2.50   "
Crystal Lake to Rockford, not including Rockford,
    and to Lake Geneva, inclusive:
    Standard lump.......... .............. .. 2.40   "
    Chunks............. ......... ............ 2.50 · "
Elsewhere, all lines:
    Standard lump.......... .............. .. 2.40   "
    Chunks.............. ......... ............ 2.50   "

" 'Mine run coal thirteen cents less than standard lump. Other-wise regulations of circular letter March 26, 1900, continue effect-ive. The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion.

                   " 'Yours truly,
                        E. T. BENT, *Sec'y.*'

    "(9) That following a meeting of said association called as aforesaid, and held in Chicago aforesaid, on October 13, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said association, as aforesaid, to-wit:

      " 'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.
                  " 'CHICAGO, ILL., *October 13, 1902.*

    " 'DEAR SIR—At a meeting held this day the following was unanimously adopted:

    " '*Resolved,* That prices of association coal, including steam and all other business, except on such continuous sales as are legally or morally binding, effective October 15, 1902, and subject to change without notice, and acceptance of orders to be subject to price rul-ing on date of shipment, shall be as follows:

Ottawa:
    Third vein standard lump and egg............$3.90 delivered
    Chunks........ ......... .................... 4.00   "
Streator and Cardiff:
    Standard lump and egg....................... 3.80   "

Joliet:
Third vein and Wilmington standard lump and
egg.............. ................ ........$3.80 delivered
Chunks............... ......... ............ 3.90      "
Streator and Cardiff standard lump and·egg.... 3.70    "
Chunks........... ......... .......... ... 3.80      "

Lemont and Lockport:
Standard lump and egg........ ...... ....... 3.40 at mines
Chunks.......... ....... ........ ......... 3.50    "

Chicago:
Wilmington (no switching)................... 3.75 delivered
Third vein and Streator........ ......... ... Open

Rockford and Freeport:.
Standard lump and egg......... ...... ..... 3.95    "
Chunks........ ......... ....... .......... 4.05    "

Galena:
Standard lump and egg......... ..... ....... 4.40    "
Chunks......ſ. ..ː...... .................... 4.50    "

Dixon:
Standard lump and egg........ ........... .... 3.90    "
Chunks........ ......... ....ː............. 4.00    "

Davenport, Rock Island, Moline, Chicago Heights,
St. Paul, Minneapolis, Milwaukee and Ft. Mad-
ison.............. .......... ........... .......Open

Clinton, Lyons and Fulton:
Standard lump and egg........... ..ː...... .. 4.25    "
Chunks......... ......ː. ............ ........ 4.35    "

Mendota and Amboy:
Standard lump and egg...ʃ...... ............. 3.80    "
Chunks.......... ........... ........ .... 3.90    "

Lostant:
Third vein and Wilmington standard lump and
egg........... ............... ........... 3.75    "
Chunks.......... ...... .... ............. 3.85    "
Streator and Cardiff standard lump and egg.... 3.60    "
Chunks.......... ............ ........... .. 3.70    "

Waukegan, Ill............... ....... ........... 3.40    "
                                          3.50    "

Rochelle and Malta:
Standard lump and egg............... ....... 4.20    "
Chunks.......... ......... ........ ......... 4.30    "

Sterling and Rock Falls:
Standard lump and egg........... .......... 4.00    "
Chunks........ ................., ,........ 4.10    "

Aurora:
    Standard lump and egg.................................$4.00 delivered
    Chunks.......................................... 4.10    "
Batavia, DeKalb, Sycamore, St. Charles and Geneva:
    Standard lump and egg....................... 4.00    "
    Chunks...................................... 4.10    "
Elgin, Earlville and West Chicago:  ·
    Standard lump and egg..................... 4.05    "
    Chunks..................................... 4.15    "
Belvidere:
    Standard lump and egg..................... 4.15    "
    Chunks..................................... 4.25    "
Alton:
    Standard lump and egg......................3.40 at mines
    Chunks................................. 3.50    "
LaCrosse:
    Standard lump and egg..................... 3.40    "
    Chunks................................. 3.50    "
West Chicago to Belvidere, not inclusive and not in-
    cluding Elgin:
    Standard lump............................. 3.40    "
    Chunks................................. 3.50    "
Crystal Lake to Rockford, not including Rockford
    and to Lake Geneva, inclusive:
    Standard lump and egg..................... 3.40    "
    Chunks................................. 3.50    "
Elsewhere, all lines:
    Wilmington and third vein standard lump and
      egg...................................... 3.40    "
    Chunks................................. 3.50    "
    Streator and Cardiff standard lump and egg.... 3.30    "
    Chunks................................. 3.40    "

"'Mine run coal thirteen cents less than standard lump, other-wise regulations of circular letter March 26, 1900, continue effect-ive. The foregoing prices are minimum, and any member is at liberty to charge more for any size at his discretion.

               "'Yours truly,

                                E. T. Bent, *Sec'y.*'

"(10) That following a meeting of the said association called as aforesaid, and held in the city of Chicago aforesaid, December 13, 1902, the following circular was prepared and sent out by said secretary to said defendant companies and said other coal mining companies represented in said asso-ciation, as aforesaid, to-wit: .

" 'NORTHERN ILLINOIS SOFT COAL ASSOCIATION.

" 'CHICAGO, ILL., *Dec. 13, 1902.*

" 'DEAR SIR—At a meeting held this day the following was unanimously adopted:'

" '*Resolved,* That at the pending annual meeting of the Illinois Coal Operators' Association, this district nominate for its members of the State executive committee Messrs. Sweet, Dalzell and Taylor.

" '*Resolved,* That at the pending annual election of the Illinois Coal Operators' Association this district urge the re-election of President Garrison and the other existing State officers.

" '*Resolved,* That on and after December 16, until further notice, circular prices on association coal, with differentials, as established in circular October 13, 1902, including steam and all other business, except on such continuous sales as are legally or morally binding, and subject to change without notice, and acceptance of orders to be subject to prices ruling on date of shipment, shall be $2.90 per ton for standard lump and egg, $3.00 for chunks and $2.50 per ton for No. 1 nut, at mines; and

" '*Resolved, further,* That no price shall be made for Chicago; that local points in Illinois on the Chicago and Alton, Wabash and Santa Fe be adjusted locally by the shippers in interest, and that all special prices, other than as above in special list of October 13, 1902, be reduced fifty cents per ton; and

" '*Resolved, further,* That no quotations, as above, be made by mail, word or in person prior to December 15, 1902.

" 'Yours truly,

E. T. BENT, *Sec'y.*'

"(11) That each of the said defendant companies was represented at one or more of the meetings aforesaid, held on September 26, 1902, October 13, 1902, and December 13, 1902, by duly authorized representatives, and most of said defendant companies have been represented at several previous meetings since the year 1897; that at said meetings held September 26, October 13 and December 13, 1902, the prices at which soft coal so mined as aforesaid should be sold in the State of Illinois and elsewhere was discussed and the prices thereof were designated, which it was agreed should be set forth in a circular and forwarded by the secretary, aforesaid, to the said defendant companies; and it was further agreed thereat that said defendant companies should send out to the trade, dealers and consumers of soft coal, in the State of Illinois and elsewhere, circulars in conformity

to said circular prices and in accordance with the action so taken as aforesaid.

"(12) That after the transmission, as aforesaid, of said resolutions, some of said defendant companies sent out circulars to the trade, dealers and consumers of said soft coal, in the State of Illinois and elsewhere, stating the prices at which the said coal so mined as aforesaid by them, respectively, would thereafter be sold in said State of Illinois and elsewhere, as aforesaid, said prices mentioned in said circulars being in conformity with those stated in said resolutions.

"(13) That all but one, to-wit, Bell & Zoller Coal Company, of said defendant companies, and said other coal mining companies represented, as aforesaid, at said meetings of said association, were at the time of the holding of the said meetings, as aforesaid, engaged in the business of operating in and mining soft coal in the said State of Illinois, and all of said defendant companies in the selling thereof to consumers thereof in the said State of Illinois and elsewhere, which said coal was then and there an article of necessity to the consumers thereof and a commodity and article of merchandise, mined and to be mined, produced and to be produced, and sold and to be sold upon the market to the public and to consumers thereof in the said State of Illinois and elsewhere.

"(14) The defendant corporations include the larger producers in northern Illinois. The State is divided into nine commercial coal producing districts, of which the northern Illinois is called the 'First.' The First District produced during the fiscal year ending June 30, 1902, about 6,000,000 tons out of the 30,000,000 tons produced throughout the State of Illinois during the same time. This coal is sold in direct competition with other districts of Illinois and eastern coal. Over two-thirds of the product of the First District is sold under contract for the year, in competition with other producers thereof, to railroad companies at prices affording little or no profit and in some cases at an actual loss.

214—28

The cost of mining coal is mainly made up of wages. The wage scale is maintained by reason of selling free coal in the fall and winter at such prices, by co-operation between producers in northern Illinois, as can be obtained in competition with other districts and States. The mining rate paid in the First District is the highest in the State. The First District shipped to Chicago in 1902 174,210 tons of bituminous coal out of a total shipment thereto of 8,712,451 tons of coal of all kinds, of which 7,434,613 was bituminous. On July 4, 1897, a national strike of bituminous miners was inaugurated, and continued in the First District until December 1, when mining wages were advanced in what is known as the Wilmington field, the Streator field and Third Vein field, both of which are in the First District, aforesaid. The following January the system of annual trade agreements in the coal mining industry of Pennsylvania, Ohio, Indiana and Illinois was inaugurated, resulting in a reduction in hours of labor from ten to eight per day, and a further advance in wages on April 1, 1898. These agreements were entered into between the United Mine Workers of America and the coal operators at a joint annual convention, composed of representatives from said workers and operators, respectively, in said four States, and like agreements as to wages being binding on miners and operators for the entire fiscal year beginning April 1 of each year, and subject to no change. At this time, January, 1898, the Illinois Coal Operators' Association, a State association, to which most of the coal operators in the State belong, was organized for the purpose, and the purpose only, of dealing with organized labor and participating in the inter-State joint movement aforesaid. April 1, 1900, a further advance of wages was fixed by agreement at an annual convention, as aforesaid, for the mining rate in northern Illinois. The abnormal demand for coal during the last few months was caused primarily by reason of the strike in the anthracite region, which began on May 1, 1902, and ended November 1, 1902. The

shortage in production of coal by reason thereof amounted to 25,000,000 tons of anthracite coal, the equivalent of 50,-000,000 tons of bituminous coal."

The court found the plaintiffs in error guilty and fixed their punishment at a fine of $500 each, and after overruling a motion for a new trial and in arrest of judgment, entered judgment upon said finding.

MASTIN & MOSS, and LAWRENCE & FOLSOM, for plaintiffs in error:

Criminal conspiracy must be "for the purpose of accomplishing a criminal or unlawful object, or an object neither criminal nor unlawful by criminal or unlawful means. Eddy on Combinations, secs. 340, 341; 6 Am. & Eng. Ency. of Law, 832; 2 McClain on Crim. Law, sec. 953.

The purpose of the association was a lawful one. Greenleaf on Evidence, (16th ed.) sec. 90; *Commonwealth* v. *Hawk,* 4 Metc. 111; *Ontario Salt Co.* v. *Salt Co.* 18 Grant's Ch. 540; *Marsh* v. *Russell,* 66 N. Y. 288; *Dolph* v. *Machine Co.* 28 Fed. Rep. 553; *Skrainka* v. *Scharringhausen,* 8 Mo. App. 522; *Shade Roller Co.* v. *Cushman,* 143 Mass. 353; *Mathews* v. *Associated Press,* 15 N. Y. Supp. 887; *Vinegar Co.* v. *Foehrenbach,* 148 N. Y. 58; *Herriman* v. *Menzies,* 115 Cal. 16; *Cohen* v. *Envelope Co.* 56 N. Y. Supp. 588.

Where the purpose is lawful the indictment must set forth the means used, so that the court may see from the indictment that if the facts therein alleged are proved, then the defendants may be convicted of the crime charged. *United States* v. *Cruikshank,* 92 U. S. 542; 2 Wharton on Crim. Law, (10th ed.) sec. 1358; *Commonwealth* v. *Hunt,* 4 Metc. 111; *Rank* v. *People,* 80 Ill. App. 40; *Smith* v. *People,* 25 Ill. 21; *State* v. *Parker,* 43 N. H. 83; *King* v. *Seward,* 3 N. & M. 557; *Alderman* v. *People,* 4 Mich. 414; *Cole* v. *People,* 84 Ill. 216; *State* v. *Maybury,* 48 Me. 218.

The law of 1874 abrogated and superseded the common law in Illinois on the subject of fixing and regulating prices,

and therefore, even if it should be held that the purpose of the association herein was unlawful, counts 2 and 4, which are drawn upon the common law, cannot be sustained. 1 Starr & Cur. chap. 38, pars. 96, 253, 471; Wharton on Crim. Pl. & Pr. (9th ed.) sec. 234; Bishop on Stat. Crimes, (2d ed.) sec. 160.

The word "any" means "every," as used in the statute of 1874. Winship on Adjudged Words and Phrases, 37.

Counts 1 and 3 of the indictment cannot be sustained, because the indictment does not charge and the agreed statement of facts does not establish a criminal conspiracy under the law of 1874.

The term "illegal," as used in the statute, means "criminal" or "unlawful," as distinguished from "void" or "nonenforceable." 1 Eddy on Combinations, secs. 341, 344; *Cote* v. *Murphy,* 159 Pa. St. 420.

The purpose of the association was a lawful one. All agreements entered into to suppress competition or increase the prices are not criminal, nor are they even unenforceable. *Steamship Co.* v. *McGregor,* 21 Q. B. Div. 544; *Insurance Co.* v. *Fire Underwriters,* 67 Fed. Rep. 310; *Cote* v. *Murphy,* 159 Pa. St. 420; *Skrainka* v. *Scharringhausen,* 8 Mo. App. 522; *Ontario Salt Co.* v. *Salt Co.* 18 Grant's Ch. 540.

The indictment is bad under the law of 1874 because it does not set forth the means used, so that the court may see from the indictment that if the facts alleged therein are proved, then the defendants may be convicted of the crime charged. *Commonwealth* v. *Hunt,* 4 Metc. 111; *United States* v. *Cruikshank,* 92 U. S. 542; *Rank* v. *People,* 80 Ill. App. 40; *Smith* v. *People,* 25 Ill. 21; *State* v. *Parker,* 43 N. H. 83; *King* v. *Seward,* 3 N. & M. 557; *Alderman* v. *People,* 4 Mich. 414; *Cole* v. *People,* 84 Ill. 216; *State* v. *Maybury,* 48 Me. 218.

The fifth count of the indictment cannot be sustained, because it was necessary that the indictment should allege and the facts prove that the defendants were incorporated

under the laws of this State, or under the laws of some other State or country for the purpose of doing business in this State. *People* v. *Fessler,* 145 Ill. 150; *People* v. *Insurance Co.* 72 Ill. App. 569.

Count 5 of the indictment cannot be sustained, because an action of debt for the recovery of the penalty, and not an indictment for conspiracy, is the proper remedy against a corporation charged with violating the so-called Anti-trust law of 1891. "May," in the first sentence of section 7 of the act of 1891, means "shall" or "must." 16 Ency. of Pl. & Pr. 239, 242; 20 Am. & Eng. Ency. of Law, (2d ed.) 239; Sutherland on Statutory Const. sec. 462; Bishop on Written Law, (2d ed.) 112; *Brokaw* v. *Highway Comrs.* 130 Ill. 482; *Railway Co.* v. *Teters,* 68 id. 144.

The proof must show that the acts of the association were assented to by each and every one of the plaintiffs in error. 2 McClain on Crim. Law, (8th ed.) 259; Wharton on Crim. Law, (10th ed.) sec. 1341; Roscoe on Crim. Evidence, (8th ed.) 571; Wright on Crim. Conspiracy, 218; *Lamb* v. *People,* 90 Ill. 73; *Rex* v. *Bolton,* 12 Cox's C. C. 87; *United States* v. *Logan,* 45 Fed. Rep. 889; *United States* v. *Johnson,* 26 id. 682.

H. J. Hamlin, Attorney General, Charles S. Deneen, State's Attorney, and A. C. Barnes, for the People:

· A conspiracy may be criminal when the object of it or the means to promote it are not in themselves unlawful,— especially where mischief to the public is involved. *Commonwealth* v. *Carlisle,* Brightley, 40; *Commonwealth* v. *Hunt,* 4 Metc. 111; *State* v. *Burnham,* 15 N. H. 396; *Coal Co.* v. *Barclay,* 68 Pa. St. 186; *Commonwealth* v. *Miflin,* 4 W. & S. 461; *Twitchell* v. *Commonwealth,* 9 Pa. St. 211; *People* v. *Sugar Refinery Co.* 2 L. R. A. 40; *People* v. *Sheldon,* 139 N. Y. 264.

The term "illegal act," as used in section 46 of the Criminal Code, means an act unlawful either under criminal or

civil law, by statute or at common law. 2 Bishop on New Crim. Law, sec. 178; Bishop on Directions and Forms, sec. 283; *Smith* v. *People,* 25 Ill. 17; *Regina* v. *Warburton,* L. R. 1 C. C. 274.

Agreements to fix and regulate prices on commodities produced in this State and to be sold therein are in violation of our so-called Anti-trust law. Starr & Cur. sec. 1, p. 1262.

Agreements of that character were at common law an unlawful combination in restraint of trade. *Gibbs* v. *Mc-Neely,* 118 Fed. Rep. 120; *Coal Co.* v. *Barclay,* 68 Pa. St. 183; *People* v. *Sheldon,* 139 N. Y. 264.

Such agreements have uniformly been held to be illegal because against public policy and injurious to public interests. *Leonard* v. *Poole,* 4 L. R. A. 728; *People* v. *Fisher,* 14 Wend. 19; *Hooker* v. *Vandewater,* 4 Denio, 449; *Stanton* v. *Allen,* 5 id. 534; *Arnot* v. *Coal Co.* 68 N. Y. 558; *More* v. *Bennett,* 140 Ill. 69; *Harding* v. *Glucose Co.* 182 id. 616; *Ford* v. *Milk Shippers' Ass.* 155 id. 166; *Distilling Co.* v. *People,* 156 id. 488; *Bishop* v. *Preservers' Co.* 157 id. 284; *People* v. *Sugar Refinery Co.* 2 L. R. A. 33.

To render the contract void it is not necessary that it should create a pure monopoly. *Cotton Oil Co.* v. *Adoue,* 15 L. R. A. 601.

It is enough to know that such contracts tend to injuriously affect public interests. Courts will not stop to inquire as to the degree of injury inflicted, nor whether the restraint be general or partial. *Nester* v. *Brewing Co.* 24 L. R. A. 251; *Cotton Oil Co.* v. *Adoue,* 15 id. 601.

Where there is no repugnancy between the common law and the statute on a subject, the statute does not operate, in the absence of express words or affirmative implication, to repeal the common law. Bishop on Stat. Crimes, secs. 154, 155, 157; *State* v. *Norton,* 3 Zabr. 33.

Inasmuch as entering into an agreement or pool to fix and regulate prices, etc., is made an indictable offense by section 1 of the act of 1891, (the Anti-trust act,) a con-

spiracy to do such illegal act is indictable under section 46 of the Criminal Code, making it an offense to conspire to do any illegal act injurious to public trade.   Starr & Cur. sec. 1, p. 1262;  Crim. Code, sec. 46.

For a violation of the Anti-trust act of 1891 criminal or civil proceedings may be instituted.  Section 1 expressly subjects offenders to indictment, and section 7 to prosecution by an action in debt.   The latter proceeding is not imperative, the word "may" in section 7 being permissive, in view of the provisions for indictment in section 1.   *Fowler* v. *Pirkins,* 77 Ill. 271;  Bishop on Stat. Crimes, sec. 112.

The business of the association being against public policy and in contravention of a statute of the State, the acts of the association and its individual members are the combined acts of all.   *Ford* v. *Milk Shippers' Ass.* 155 Ill. 166.

The crime was consummate and complete by the fact of the unlawful combination.  *Commonwealth* v. *Hunt,* 4 Metc. 111;  *Hazen* v. *Commonwealth,* 11 Harris, 362;  *State* v. *Noyes,* 25 Vt. 415.

A new party agreeing to the plans of conspirators and coming in and assisting them becomes one of them.  *United States* v. *Nunnemacher,* 7 Biss. 211;  *People* v. *Mather,* 4 Wend. 29.

Where the language of the statute sufficiently describes the act constituting the offense, then no more is required than that the words of the statute be employed in the information or indictment.  *Williams* v. *People,* 67 Ill. App. 345.

Where the act to be accomplished by the conspiracy is illegal, it is unnecessary to specify the means by which it was intended to be accomplished.  *Thomas* v. *People,* 113 Ill. 536;  *Johnson* v. *People,* 22 id. 314;  *Smith* v. *People,* 25 id. 17;  *Cowan* v. *People,* 14 id. 348;  *Cole* v. *People,* 84 id. 216.

A combination in restraint of trade, by enhancing prices among other things, was an unlawful combination at common law.  *Gibbs* v. *NcNeely,* 60 L. R. A. 155.

The amendment of 1897 to the Anti-trust act of 1891 was invalid and void from the beginning, (*People* v. *Iron Co.* 201 Ill. 236,) and consequently it afforded no protection to combinations under its proviso.

Mr. Justice Hand delivered the opinion of the court:

It is first urged that the court erred in overruling the motion to quash the indictment. It will be remembered two of the counts (the second and fourth) charge a conspiracy as at common law, the first and third a violation of section 46 of the Criminal Code and the fifth a violation of section 1 of the Anti-trust act of 1891.

The first point made against the indictment is, that the second and fourth counts do not charge a conspiracy at common law, in this: that the acts charged are not criminal or unlawful. Those counts charge that the object of the conspiracy was unlawful, and not that its object was lawful and the means for its accomplishment unlawful. It was therefore unnecessary to set out the means whereby the conspiracy was to be accomplished. (*Thomas* v. *People,* 113 Ill. 531.) Neither was it necessary that the object of the conspiracy constitute an offense against the criminal law for which an individual might be indicted and convicted; (*Smith* v. *People,* 25 Ill. 9;) but if the object thereof was unlawful, said counts sufficiently charge a conspiracy at common law. The term "unlawful," as here used, does not include every act which violates the rights of a private individual and for which the law affords a civil remedy, but is held to include those acts which, by reason of the combination, have a harmful effect upon society and the public; and a combination may amount to a conspiracy although its unaccomplished object be to do that which, if actually done by an individual, would not amount to an indictable offense, and in that sense a conspiracy may consist of a combination to do what is merely unlawful. The counts now under consideration charge the plaintiffs in error with having conspired together

to do an illegal act injurious to the public trade,—that is to say, to regulate and fix the price at which coal should be sold. A combination between independent producers of coal to prevent competition in the sale of that article, which is a necessary of life, is an act inimical to trade and commerce and detrimental to the public and unlawful, and amounts to a common law conspiracy, regardless of what may be done in furtherance of the conspiracy.

The case of *Smith* v. *People, supra,* is a leading case. The defendants were indicted and convicted of having conspired together to seduce a female child of the age of sixteen years. The court said (p. 13) : "To attempt to define the limit or extent of the law of conspiracy, as deducible from the English decisions, would be a difficult, if not an impracticable, task. * * * We may safely assume that it is indictable to conspire to do an unlawful act by any means, and also that it is indictable to conspire to do any act by unlawful means. In the former case it is not necessary to set out the means used, while in the latter it is. * * * But the great uncertainty * * * is as to what constitutes an unlawful end, to conspire to accomplish which is indictable without regard to the means to be used in its accomplishment. * * * This indictment falls under the first class. * * * If the term 'unlawful' means criminal or an offense against the criminal law, and as such punishable, then the objection taken to this indictment is good, for seduction, by our law, is not indictable and punishable as a crime. But by the common law governing conspiracies the term is not so limited, and numerous cases are to be found where convictions have been sustained for conspiracy to do unlawful acts although those acts are not punishable as crimes. Nor yet would it be quite safe to say that the term 'unlawful,' as here used, includes every act which violates the legal rights of another, giving that other a right of action for a civil remedy. * * * It is sufficient for the present case to say that conspiracies to accomplish purposes which are not by law punishable as

crimes, but which are unlawful as violative of the rights of individuals and for which the civil law will afford a remedy to the injured party, and will at the same time and by the same process punish the offender for the wrong and outrage done to society by giving exemplary damages beyond the damages actually proved, have in numerous instances been sustained as common law offenses. The law does not punish criminally every unlawful act, although it may be a grievous offense to society; and in determining what sort of conspiracies may or may not be entered into without committing an offense punishable by the common law, regard must be had to the influence which the act, if done, would actually have upon society, without confining the inquiry to the question whether the act might itself subject the offender to criminal punishment."

In *People* v. *North River Sugar Refining Co.* 2 L. R. A. 33, the Supreme Court of New York, in speaking of a combination formed for the purpose of controlling the price of sugar, said: "All the cases, ancient and modern, agree that a combination, the tendency of which is to prevent general competition and to control prices, is detrimental to the public and consequently unlawful."

And in *Texas Standard Cotton Oil Co.* v. *Adoue,* 15 L. R. A. 598, the Supreme Court of Texas held a combination to prevent competition and create fictitious prices, independently of the law of demand and supply, and to such an extent as injuriously to affect the interests of the public or any particular class of citizens who may be especially interested, either as producers or consumers, in the articles or staples affected by the contract, is void, as in restraint of trade.

And in *State* v. *Phipps,* 18 L. R. A. 657, the Supreme Court of Kansas held that a combination between insurance companies to control and increase the rates of insurance was in violation of the anti-trust laws of that State declaring unlawful all trusts and agreements in restraint of trade.

And in *Nester* v. *Continental Brewing Co.* 24 L. R. A. 247, the Supreme Court of Pennsylvania held the true test of the illegality of a combination to restrict trade is its effect upon the interest of the public, and that a combination of brewers fixing a minimum price at which any of them should sell beer to the customers of another or to new trade was void, as against public policy.

And in *United States* v. *Jellico Mountain Coke and Coal Co.* 46 Fed. Rep. 432, (12 L. R. A. 753,) a combination between coal producers in one State and coal dealers in another, to regulate prices of coal in Nashville, Tenn., was held a violation of the act of Congress prohibiting conspiracies in restraint of trade and commerce.

And in *People* v. *Sheldon,* 139 N. Y. 251, (23 L. R. A. 221,) the court, in passing upon the legality of an organization of coal dealers intended to prevent competition, said: "The *gravamen* of the offense of conspiracy is the combination. Agreements to prevent competition in trade are, in contemplation of law, injurious to trade because they are liable to be injuriously used. * * * We are of opinion that the principle upon which the case was submitted to the jury is sanctioned by the decisions in this State, and that the jury were properly instructed that if the purpose of the agreement was to prevent competition in the price of coal between retail dealers it was illegal and justified the conviction of the defendants."

And in *Morris' Run Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173, the question before the court was whether the contract was illegal, as being contrary to the statute of New York or at common law, as against public policy. The court said: "The referee found, as his conclusion upon the whole case, that the contract was void by the statute and void at common law, as against public policy. * * * The combination is wide in scope, general in its influence and injurious in effects. These being its features, the contract is against public policy, illegal, and therefore void." After

citing similar cases the court further said: "An important principle stated in these cases is, that as to contracts for a limited restraint the courts start with a presumption that they are illegal, unless shown to have been made upon adequate consideration and upon circumstances both reasonable and useful. This presumption is a necessary consequence of the general principle that the public interest is superior to private and that all restraints on trade are injurious to the public in some degree. The general rule * * * is, that all restraints of trade, if nothing more appear, are bad."

In *State* v. *Buchanan,* 5 Harr. & J. 317, the defendants were indicted in one count for an executed conspiracy to cheat and defraud the president, directors and company of the Bank of the United States, and in a second count for a conspiracy only to cheat and defraud the same parties. The defendant's demurrer was sustained by the trial court, whereupon the State took the case to the Court of Appeals by writ of error. Buchanan, J., after reviewing the English authorities, said: "From all which it results that every conspiracy to do an unlawful act, or to do a lawful act for an illegal, fraudulent, malicious or corrupt purpose, or for a purpose which has a tendency to prejudice the public in general, is at common law an indictable offense, though nothing be done in execution of it and no matter by what means the conspiracy was intended to be effected, which may be perfectly indifferent and makes no ingredient of the crime, and therefore need not be stated in the indictment."

And in *Ford* v. *Chicago Milk Shippers' Ass.* 155 Ill. 166, this court, on page 179, said: "The purpose of the arrangement between this corporation and the stockholders thereof was to fix the price and control and limit the quantity of milk shipped. The purposes attempted to be accomplished through the corporation were illegal."

The contention is also made that the common law on the subject of regulating and fixing prices in this State was repealed by sections 46 and 130 of the Criminal Code, and that

for that reason the second and fourth counts of the indictment cannot be maintained. It is a common practice in the criminal courts to proceed against an offender either under the statute or at the common law, or under both. It is not claimed the common law upon the subject of regulating and fixing prices in this State is repealed by direct enactment. If repealed, therefore, it must be by implication. The courts do not favor repeals by implication. We have examined the sections of the statute pointed out and do not think they are so far repugnant to the common law as to work a repeal thereof, and section 46 recognizes in express terms the common law of conspiracy upon the subject under consideration to be in force in this State and provides for the punishment thereof. There being no repugnancy between the common law and the statute, the contention that the common law has been repealed is without force. In *State* v. *Norton,* 3 Zabr. 33, where a conspiracy statute did not contain a clause repealing the common law, it was held that the common law offense of conspiracy was not abolished by such statute, but that every conspiracy which was indictable at common law before the passage of the act was still indictable.

It is urged that the first and third counts of the indictment cannot be sustained, as it is said section 46 of the Criminal Code, under which those counts were framed, was repealed by the Anti-trust act of 1891. Said section 46 provides, if two or more persons conspire or agree together to do an illegal act injurious to the public trade they shall be guilty of conspiracy, while section 1 of the Anti-trust act provides, if any corporation shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation to regulate or fix the price of any article of merchandise or commodity manufactured, mined, produced or sold in this State, such corporation shall be deemed guilty of conspiracy. The legislature by those enactments created two offenses. By section 46 it is made a criminal offense to

conspire to do an illegal act injurious to the public trade, whether any act is done to effect the object of the conspiracy or not, while by the Anti-trust act of 1891 it is made a criminal offense to enter into an agreement to regulate or fix the price of any article of merchandise or commodity manufactured, mined, produced or sold in this State. Manifestly there is a distinction between a conspiracy to do an illegal act, as provided by section 46, and the actual performance of the act, as provided by the Anti-trust act of 1891. The conspiracy to do the act is one crime, the doing of the act is another. There is therefore no repugnancy between the two enactments.

It is contended that the fifth count of the indictment is defective by reason of the fact that it fails to allege the plaintiffs in error were incorporated under the laws of this or the laws of some other State or country "for transacting or conducting any kind of business in this State." The indictment alleges that the plaintiffs in error were incorporated, which we think was all that was necessary. While the language, "if any corporation organized under the laws of this or any other State or country for transacting or conducting any kind of business in this State," is found in section 1 of the act of 1891, it becomes apparent, when the entire statute is read, that the object thereof was to prevent the formation of combinations to regulate and fix prices or to limit the amount of production in this State by corporations or by individuals doing business in this State, and that it is a matter of indifference whether such corporations are organized for transacting or conducting business in this State or not. If a corporation doing business in this State violates the provisions of said statute it is amenable to the terms thereof, regardless of where it was organized and whether or not it was authorized to transact or conduct business in this State. To hold that before the statute would apply to a corporation it must be shown that it was organized to transact and conduct business in this State would be to nullify the statute.

It is also urged that the plaintiffs in error cannot be prosecuted by indictment for a violation of the act of 1891 because, it is said, the remedy is by action of debt. Section 3 of said act provides for the punishment of violators thereof by fine, and section 7 provides that the fine imposed for a violation of said statute may be recovered by an action of debt in the name of the People. Section 1, however, provides that a violation of said statute shall subject the offender to a prosecution by indictment. The word "may," in section 7, is used in a permissive sense, and the State has the right to prosecute by indictment or may bring an action of debt to recover the fine imposed for a violation of the statute.

It is said the first and third counts fail to allege a criminal intent. The charge is, the plaintiffs in error unlawfully, fraudulently, maliciously, wrongfully and wickedly conspired and agreed together to do an illegal act. The language of the statute is: "If any two or more persons conspire or agree together, * * * with the fraudulent or malicious intent wrongfully and wickedly * * * to do any illegal act, * * * they shall be deemed guilty of a conspiracy." A charge that the conspiracy was formed unlawfully, fraudulently, maliciously, wrongfully and wickedly, while not in the language of the statute, in effect charges the conspiracy to have been formed with a fraudulent or malicious intent wrongfully and wickedly to do an illegal act injurious to the public, and is sufficient.

We think the indictment, and each count thereof, sufficient, and that the court did not err in overruling the motion to quash the indictment.

The plaintiffs in error submitted to the trial court twenty-two propositions in writing, and asked that court to hold said propositions to be the law which should govern it in its decision of this case. The court declined to consider said propositions or to mark them "held" or "refused," and it is contended that the action of the court in that regard constituted reversible error. We are of the opinion section 42 of

the Practice act, which provides for the submission of propositions of law to the court where a case is tried without a jury, does not apply to the trial of a criminal case before the court without a jury. In the trial of an action at law before the court without a jury, under the practice in force in this State, the only method of preserving for review questions of law in the Appellate and Supreme Courts is by the submission of propositions of law. Such is not the practice in criminal cases. All the questions discussed in plaintiffs in error's brief were properly preserved for review by the motion to quash, the motion to exclude evidence, the motion for a new trial and the motion in arrest of judgment. It was not necessary to preserve the questions by propositions of law. The court did not err in declining to consider the said propositions.

It is further contended that the facts found in the agreed statement of facts submitted to the trial court do not show the guilt of the plaintiffs in error, as it is said those facts may all be admitted to be true and the plaintiffs in error be innocent. It appears that the association of which the plaintiffs in error were members was a voluntary association formed many years ago; that the plaintiffs in error, with one exception, were engaged in mining coal; that the association had an acting president and secretary; that in 1897 it assumed the name of "The Northern Illinois Soft Coal Association;" that its expenses were paid out of assessments made upon its members; that subsequent to 1897 its meetings were held in the city of Chicago; that its meetings were called by its secretary; that a copy of the minutes of its proceedings at each meeting was sent to its several members; that the association held meetings on March 26, 1900, September 26, 1902, October 13, 1902, and December 13, 1902, at which the price at which the members of the association should sell coal in northern Illinois was discussed and fixed; that each of the plaintiffs in error was represented at one or more of the meetings held in 1902; that circulars showing the price at which coal was to be sold by the members of the

association in numerous towns and cities of northern Illinois were prepared at the meetings held on September 26 and October 13 and sent to the members of the association, and by several of the members of the association sent to the trade in the territory in which the members of the association sold coal. The trial court held,—and we think properly, in view of those facts and other admitted facts found in this record, —that the members of said association had entered into a combination to regulate and fix the price at which coal should be sold in northern Illinois. That it is unlawful to enter into such a combination at common law and under the statutes of this State there can be no doubt. *Craft* v. *McConoughy,* 79. Ill. 346; *More* v. *Bennett,* 140 id. 69; *Foss* v. *Cummings,* 149 id. 353; *Ford* v. *Chicago Milk Shippers' Ass. supra; Harding* v. *American Glucose Co.* 182 id. 551; *People* v. *Sheldon, supra; Morris' Run Coal Co.* v. *Barclay Coal Co. supra; State* v. *Buchanan, supra.*

In *Craft* v. *McConoughy, supra,* a contract was entered into by the grain dealers of Rochelle, which, on its face, indicated they had formed a partnership for the purpose of dealing in grain, but the true object of which was to form a secret combination which would stifle all competition and enable the parties, by secret and fraudulent means, to control the price of grain, cost of storage and expense of shipment at such town. The court, on page 350, said: "While these parties were in business, in competition with each other, they had the undoubted right to establish their own rates for grain stored and commissions for shipment and sale. They could pay as high or low a price for grain as they saw proper and as they could make contracts with the producer. So long as competition was free the interest of the public was safe. The laws of trade, in connection with the rigor of competition, was all the guaranty the public required, but the secret combination created by the contract destroyed all competition and created a monopoly against which the public interest had no protection."

In *More* v. *Bennett, supra,* the plaintiffs and defendants were members of the Chicago Law Stenographers' Association, and the suit was brought to recover damages claimed to have resulted from an alleged breach of certain of the rules and by-laws of said association. The court, after an exhaustive review of the authorities, on page 79, said: "The doctrine of the foregoing decisions may, in our opinion, be fairly applied to the facts in the present case. While some of the cases cited involve elements not present here, the determining circumstance in all of them seems to have been a combination or conspiracy among a number of persons engaged in a particular business to stifle or prevent competition, and thereby to enhance or diminish prices to a point above or below what they would have been if left to the influence of unrestricted competition. All such combinations are held to be contrary to public policy, and the courts, therefore, will refuse to lend their aid to the enforcement of the contracts by which such combinations are sought to be effected."

In *Foss* v. *Cummings, supra,* a combination was formed to force up the price of corn upon the Chicago markets. The venture proved to be a losing one. The appellants brought assumpsit against the others in the combination to recover moneys paid out in the transaction. On page 359 the court said: "It was an attempt to advance the price of corn beyond the natural market by a combination between the parties, and that the law condemns, as against public right, and void, and forbids the courts to lend their aid to those engaged therein. 'All compacts between merchants, speculators or any class of men to elevate or depress the market are injurious to the public interest and in restraint of trade. When such a purpose is apparent in a contract it strikes the agreement with nullity. Such a combination of dealers is nothing less than a conspiracy against trade, entered into for selfish purposes and tending to make the poor poorer and the rich richer. Whether the design is to bring the price of any commodity to a point below its value in a fair and open market or to

raise it above its true worth, the illegality of the combination is the same. Such design will not be furthered by the courts, though there may be circumstances under which the object of such a contract does not sufficiently appear to expose the illegality. If the true character is known the contract will be held void.' * * * It makes no difference that the agreement is only in partial restraint of trade. If the public is injuriously affected (and that is necessarily so when the combination tends to increase the price of a commodity of general use) it is illegal."

In *Morris' Run Coal Co.* v. *Barclay Coal Co. supra,* five coal companies in Pennsylvania entered into an agreement in New York to divide two coal regions of which they had control, to appoint a committee to take charge of their interests and decide all questions, and appoint an agent at a certain point in the State of New York, the coal mined to be delivered through him, each company to deliver its proportion at its own cost at the different markets, at such time and to such persons as the committee should direct, the committee to adjust all prices, rates of freight, etc., and settlements to be made between the several companies monthly, and it was held in a suit brought by one of said companies against another to enforce a liability arising under said contract, that the contract was in violation of a statute of New York making it a misdemeanor to conspire to commit any act injurious to trade or commerce, and was also against public policy, and therefore illegal and void. The court laid down the rule, among other things, that every association formed to raise or depress prices beyond what they would be if left without aid or stimulus was criminal.

It is urged that the evidence does not show that the several plaintiffs in error entered into the said combination. The evidence does, however, show that the plaintiffs in error were all members of said association; that one of the objects of said association, viz., to regulate and fix the price at which coal should be sold by the members of said association

in northern Illinois, was unlawful, and that at one or more
of the meetings of the association at which the representa-
tives of the several plaintiffs in error were present the price
at which coal should be sold in northern Illinois by the mem-
bers of the association was discussed, and that the price at
which coal should be sold by the members of the associa-
tion in northern Illinois was actually fixed at said meetings.
The offense was committed so soon as the combination was
formed, (*Commonwealth* v. *Hunt,* 4 Metc. 111,) and after
an unlawful combination is formed the acts of the different
parties to the combination which tend to further its purposes
bind all parties to the combination. In *Lasher* v. *Littell,* 202
Ill. 551, on page 555, the court said: "The conspiracy being
established, everything said, written or done by either of the
conspirators in execution or furtherance of the common pur-
pose is deemed to have been said, done or written by every
one of them and may be proved against each."

The fact that the effect of the action of the association was
not to give the plaintiffs in error a complete monopoly of the
coal trade in the territory in which they sold coal will not re-
lieve plaintiffs in error from the criminal effect of forming
said combination. (*More* v. *Bennett, supra; Foss* v. *Cum-
mings, supra; Texas Standard Cotton Oil Co.* v. *Adoue,
supra.*) In the last case it was held, to render the contract
void it is not necessary that it should create a pure monopoly.
And in *United States* v. *Knight,* 156 U. S. 1, it was said:
"All the authorities agree that in order to vitiate a contract
or combination it is not essential that its results should be a
complete monopoly. It is sufficient if it really tends to that
end and to deprive the public of the advantages which flow
from free competition." And in *More* v. *Bennett, supra,* it
was said (p. 80): "True, the restraint is not so far-reach-
ing as it would have been if all the stenographers in the city
had joined the association, but so far as it goes it is precisely
of the same character, produces the same results and is sub-
ject to the same legal objection. * * * We can see no

legal difference between the restraint upon competition which
it now exercises and that which it will exercise when it is in
a position to dictate terms to all who are engaged in the busi-
ness and to all who may wish to obtain the services of law
stenographic reporters."

The object of the association being against public policy
and illegal, the individual members thereof are liable for the
combined acts of all, (*Ford* v. *Chicago, Milk Shippers' Ass.
supra,*) and the plaintiffs in error cannot be relieved from
the legal effect of their acts by reason of the fact that the or-
ganization was voluntary and that no articles of association
were reduced to writing.   (*Harding* v. *American Glucose
Co. supra; Patnode* v. *Westenhaver,* 114 Wis. 460.)    In
the *American Glucose case, supra,* on page 617, the court
said: "It makes no difference that the agreement for the il-
legal combination is not a formal written agreement.  It may
be a verbal agreement or understanding, or a scheme not em-
bodied in writing but evidenced by the action of the parties."
In *Patnode* v. *Westenhaver, supra,* it was said: "An agree-
ment expressly entered into was not necessary.  A mere tacit
understanding between conspirators to work to a common
purpose is all that is essential to a guilty, actionable combina-
tion.  Individual intent by two or more persons to do an un-
lawful act or a lawful act by unlawful means is the first step
in that regard.  Next follows concurrence between such indi-
viduals,—not concurrence of action, merely, (*United States
v. Barrett,* (C. C.) 65 Fed. Rep. 62,) but concurrence in
mental intent to effect the common purpose, each to aid the
others in that regard.  Mutuality in the undertaking may be
secured without any express agreement, and without a spoken
or written word between the conspirators or a meeting of the
members of the combine, or their even all knowing each
other, or the precise thing to be accomplished or plans for its
accomplishment, either in a general way or in detail, being
distinctly stated by any member of the combine to any other
member.  If there is a meeting of minds, brought about in

454 · HARMAN v. THE PEOPLE. [214 Ill.

any way, to accomplish the common purpose, the essentials of a guilty combination are all satisfied."

Nor can the plaintiffs in error be relieved by reason of the passage of the proviso of 1897 to the Anti-trust act of 1891. That proviso was unconstitutional, (*People* v. *Butler Street Foundry and Iron Co.* 201 Ill. 236,) and no right can be predicated upon an unconstitutional law. In *Norton* v. *Shelby County,* 118 U. S. 425, on page 442, it was said: "An unconstitutional act is not a law. It confers no rights; it imposes no duties; it affords no protection; it creates no office. It is, in legal contemplation, as inoperative as though it had never been passed."

We find in this record no reasons for disturbing the judgments of the lower courts. The judgment of the Appellate Court will therefore be affirmed.

*Judgment affirmed.*