## W. M. Sanford, et al., v. The People of the State of Illinois.

- Gen. No. 11,268.

1. CONSPIRACY—*common law offense of, not superseded.* The General Conspiracy Statute of 1874 did not repeal the common law with respect to criminal conspiracy.

2. CONSPIRACY—*act of 1891 did not repeal conspiracy statute of 1874.* The act of 1891 pertaining to trusts, pools and combinations did not operate to repeal the general statute of 1874.

3. CONSPIRACY—*when combination is illegal and criminal.* A combination, the tendency and manifest intent of which is to prevent general competition and so to control trade in a community and to enable members of such combination to dictate prices, is illegal and in violation both of the common law, the general conspiracy act of this State, and the act of 1891 pertaining to trusts, pools and combines.

4. CONSPIRACY—*what not essential to render combination in restraint of trade illegal.* To render such a combination illegal and criminal, it is not essential that it should appear that it did, in fact, create a monopoly.

Criminal prosecution for conspiracy. Error to the Criminal Court of Cook County; the Hon. OLIVER H. HORTON, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1903. Affirmed. Opinion filed October 6, 1905.

**Statement by the Court.** January 19, 1903, a special grand jury returned into the Criminal Court of Cook county an indictment containing eight counts against the plaintiffs in error herein for a conspiracy to do an illegal act injurious to public trade, etc.

. The first count charges that the defendants "unlawfully, fraudulently, maliciously, wrongfully and wickedly did conspire and agree with one Delos Hull" and other persons whose names are unknown "to do an illegal act injurious to the public trade, to wit: to then and there in restraint of trade and to the injury of the public trade, unlawfully create, enter into and become members of and parties to a pool, trust, agreement, combination, confederation and understanding with each other to suppress, destroy and prevent

competition in the sale and delivery and distribution of coal
to consumers and to the general public in the State of Illi-
nois and in the State of Wisconsin to the great damage and
injury of all purchasers of said coal and contrary to the stat-
ute and against the peace and dignity of the State of
Illinois."

The second count is practically the same. The third count
charges that the conspiracy and combination were "then and
there to unlawfully regulate and fix the price at which coal
should be sold in the State of Illinois," the same being "an
article of necessity to consumers thereof and to the general
public" and an article of merchandise. The fourth count
charges that the purpose of the conspiracy was "to regulate,
fix and raise the price at which coal should be sold."

The fifth count charges a conspiracy to suppress compe-
tition "by limiting sales of coal made or to be made to con-
sumers in such localities to retail vendors thereof only and
by limiting the territory in which the members of said com-
bination or conspiracy engaged in business of selling coal at
retail should thereafter make sales and delivery of coal to
consumers, and by limiting the right of wholesale dealers
in coal to make sales and delivery of coal to consumers, and
by limiting the right of wholesale dealers in coal to make
sales and delivery of coal to only such persons as conformed
to the rules and regulations of said members of said combi-
nation and conspiracy," which rules required each person
selling coal to comply with conditions specified.

The sixth count charged that the defendants each then and
there being engaged in or interested in the business of selling
to the general public, and then and there in competition with
various retail dealers in said business, and unlawfully con-
triving and intending unjustly and oppressively to increase
and raise the price at which the coal to be sold by them
should be sold, and to suppress and destroy competition
among the said several retail dealers and vendors of coal
and to fix a price at which said coal should be sold unlawfully
then and there did combine, confederate, conspire and agree
together with one Delos Hull and other persons whose names

are unknown, to raise, fix and keep up the prices at which coal should be sold in the respective localities in the State of Illinois and the State of Wisconsin in which said conspirators were and might be engaged or interested in the business of selling coal to the consumers thereof, and to that end did unlawfully in pursuance of and as part of said conspiracy agree that none of the members of said conspiracy and confederation would make or cause to be made any shipments of coal into the territory that might be recognized among the said members of said conspiracy as the territory to which such members should confine his or their sales and delivery of said coal, and to that end did unlawfully in pursuance and as a part of said conspiracy agree that coal should not be sold by them or either of them at a price below a certain fixed minimum price then fixed and from time to time agreed to be fixed by them jointly or through a committee appointed or to be appointed for said purpose, such minimum price being greatly in excess of the prices at which coal had been accustomed to be sold in said territory, to the great injury of. purchasers of said coal and contrary to the law.

The seventh count charged that said defendants conspired to increase, raise and keep up the price at which coal should thereafter be sold in the State of Illinois and the State of Wisconsin, and to suppress, destroy and prevent competition in the sale of coal in said states.

The eighth count charges that the defendants conspired, combined, confederated and agreed to create, enter into and become members of and parties to an agreement, combination, confederation and understanding with each other then and there to suppress, destroy and prevent competition in the sale of said coal in the respective states and parts of states in which each respectively was engaged or interested in said business of selling coal as aforesaid, directly to the consumers thereof, and in pursuance of said unlawful agreement and combination, formed themselves into a voluntary association called the Retail Coal Dealers Association of Illinois and Wisconsin, for the purpose of preventing shipment, delivery and sale of coal by any mine operator, wholesale ship-

per, jobber or their agents, to any consumer except to railroads, gas companies, blast furnaces, transportation companies and manufacturers where said coal is used for manufacturing purposes only in Illinois and Wisconsin, where there is a member of said association engaged in the business of selling and delivering coal to consumers and for the purpose of restricting competition among the members of said association by limiting the right of any member to make sales and delivery of coal in the territory or locality recognized by said association and its members as the territory of other members of said association, etc.

A motion to quash the indictment was overruled, the defendants were arraigned and pleaded not guilty. Upon the trial the jury returned a verdict finding each of the defendants "guilty of conspiracy in manner and form as charged in the indictment" and fixing the punishment of each defendant at a fine.

The bill of exceptions shows an agreed statement of facts upon which the case was submitted, being received as the only evidence of facts in the trial. Such agreed statement is in part as follows:

"That the Retail Coal Dealers' Association of Illinois and Wisconsin is a voluntary association, whose membership is composed of certain retail dealers in coal in the states of Illinois and Wisconsin; that said association was organized more than three years ago in the City of Chicago, County of Cook and State of Illinois, and has maintained its office during its entire existence in said city; that its officers are elected annually; that its officers elected and serving for the year from July 1, 1902, to July 1, 1903, are as follows, to wit: President, W. M. Sanford; vice-president, C. S. Lusk; secretary, Frank E. Lukens; treasurer, Gus Aucutt; executive board, E. H. Keeler, Delos Hull, Frank McGrew, F. M. Durkee, C. L. Marston and R. C. Brown, being parties named in the indictment herein; that all of said parties were acting in the capacity of said officers, respectively, at the time of the indictment herein; that each of said persons, with the

exception of Frank E. Lukens, had been personally engaged. in the business of selling coal at retail for more than three years past, each in his respective locality in the State of Illinois or State of Wisconsin; that said Frank E. Lukens has not been engaged in the business of selling coal at wholesale or retail since the organization of said association, but has acted as secretary of said association during its existence; that the residences of the several defendants, respectively, are as stated in the pamphlet hereinafter set forth containing the constitution and by-laws of said association; that all of said defendants except Lukens are engaged in the retail coal business at said places respectively; that all of said defendants are citizens of the United States."

Then follows the constitution and by-laws adopted by said association and in force since January 1, 1901; parts of which not deemed material are omitted from this statement.

## CONSTITUTION.

### ARTICLE I.

#### NAME AND OBJECT.

SECTION 1.    The title of this organization shall be "Retail Coal Dealers' Association of Illinois and Wisconsin."

SEC. 2.    The object of this Association shall be the protection of its members against the shipment of coal direct to consumers or scalpers, by mine operators, wholesale shippers, jobbers, or their agents, and the general improvement and elevation of the coal trade in the States of Illinois and Wisconsin.

### ARTICLE II.

#### MEMBERSHIP.

SECTION 1.    Any firm, individual or corporation, owning or leasing and operating a coal yard, having a set of scales, keeping an office during regular business hours, with a competent person in charge to attend to the wants of customers at all times, and who has storing capacity for one or more cars of coal, and is REGULARLY and CONTINUOUSLY

engaged in the sale of coal at retail in the States of Illinois and Wisconsin, shall be eligible to membership in this Association.

SEC. 2.   A person buying carloads, and delivering direct from the same, shall not be considered a dealer within the meaning of this Article.

SEC. 3.   Mine operators, wholesale shippers, jobbers, or their representatives, may become honorary members of this Association, and such membership shall entitle them to all the privileges of the Association, except the right to vote in any of the transactions of the meetings of the Association or the Executive Board.

## ARTICLE III.

### COMPLAINTS.

SECTION 1.   All complaints shall be made to the secretary in writing, giving as full information as possible, including dates of shipment and arrival, car number and initials, original point of shipment, names of consignor and consignee and any other particulars that can be learned.

SEC. 2.   All complaints to be handled by this Association must be filed with the secretary within sixty days after receipt of shipment at point of destination, and no complaint from any member will be considered when made on account of sales or shipment made within thirty days after the date of said member's certificate of membership.

SEC. 3.   Nothing in the foregoing sections shall be construed so as to entitle members to make complaints on account of sales and shipments of anthracite and bituminous coal, coke, smithing coal, etc., to railroads, gas companies, blast furnaces, transportation companies, or manufacturers, where said coal is used for manufacturing purposes only.

SEC. 4.   It shall be contrary to the principles of this Association for any mine operator, wholesale shipper, jobber or their agents to ship coal upon the order of a regular coal dealer, for delivery at any point other than where such dealer may have a yard and is regularly established in the business,

and any mine operator, wholesale shipper, jobber or their agents, making such shipment into the territory of other retailers, who are members of this Association, will be considered as having sold or shipped a consumer.

SEC. 5. It shall be contrary to the spirit of this Association for any of its retail members to make or cause to be made, shipments into the legitimate territory of other members of the Association, and members who shall offend shall be subject to the same conditions as shipments made by wholesale members.

SEC. 6. Shipments for public or private schools, city and county buildings, shall be considered as shipments direct to consumers.

SEC. 7. It shall be the duty of the secretary to at once notify the party or parties against whom complaint has been made. If the transaction was made through or by a jobber, mine agent, or other person, the principal for whom they act or the shipper from whom they receive the coal shall also be notified and shall be considered jointly liable.

SEC. 8. If it be found impossible to adjust a claim through the efforts of the secretary, then the matter shall be referred to the Executive Board, whose decisions shall be final and binding on all parties.

## ARTICLE IV.

### TERRITORY.

Members shall be entitled to the protection of this Association at only such places where they operate yards as they shall desire to have placed on the membership lists, and for which they shall pay annual dues for each place so protected.

## ARTICLE IX.

### RECIPROCITY.

Whereas, As reciprocity is in direct line with the principles of this Association, we hereby pledge ourselves to purchase goods of only those mine operators, wholesale shippers, jobbers or their authorized representatives who recognize the

principles of this organization and make it their uniform practice to distribute their goods only through the legitimate channels of the trade, and who may be eligible to honorary membership in this Association.

## SECTION 6.

### EXECUTIVE BOARD.

It shall be the duty of the Executive Board to hear and determine all complaints made by any member of this Association, when duly reported to them by the Secretary, and their decision shall be binding upon all members of this Association. They shall have the power, by a two-thirds vote, to remove or suspend any official for any just cause, and appoint a member of the Association to fill the vacancy. Furthermore, they shall have the power, by a two-thirds majority vote, to suspend or expel any member for any conduct which in their opinion might endanger the welfare, interest or character of the Association. No vote shall be taken on a proposed suspension or expulsion until after ten days' notice in writing has been sent the member in question, setting forth the charges preferred against him or them. The defendant shall have the right to be heard, either in person or by writing, and shall have the privilege to offer any testimony he may desire before final vote thereon.

Upon request of the Secretary, said Board shall convene to determine and adjudicate such matters as are not clearly defined by the Constitution and By-Laws, or such other questions as he deems of great importance to the Association.

Four members of the Executive Board shall constitute a quorum for the transaction of business at any meeting, notice by mail having been given each officer ten days prior thereto.

## SECTION 7.

### QUORUM.

In all the meetings of the Association, fifteen members shall constitute a quorum for the transaction of all business.

## SECTION 9.

### EXPENSE OF OFFICERS.

The legitimate expenses of officers and the members of the Executive Board, in attending meetings of the Board, shall be paid out of the funds in the treasury of the Association.

## SECTION 10.

### SHIPMENTS AND PENALTIES.

Whenever, and as often as any mine operator, wholesale shipper, jobber, or their agents, shall sell coal to any person not a regular dealer, except as provided in Art. III, Sec. 3, of Constitution, shipper will be considered as having sold and shipped to a consumer, and the penalty for said shipment shall be fifty cents per ton for each ton of anthracite coal and twenty-five cents per ton for each ton of bituminous coal, smithing coal, or coke thus sold. Whenever the secretary of this Association shall succeed in collecting any claim made against the mine operator, wholesale shipper, jobber, or their agents, upon coal sold to the consumer, as provided in the Constitution and By-Laws, eighty per cent of the sum so collected shall be paid in equal parts to the members of the Association who shall be located at the point where such sale is made, and if there be but one member, then eighty per cent of all the sum so collected shall be paid to him, and the remainder shall be turned into the treasury of the Association.

## SECTION 11.

### SHIPPERS LOSE STANDING.

Any mine operator, wholesale shipper, jobber or their agents, who shall sell coal direct to a consumer in any town or city where there is a member of this Association shall be deemed as withdrawing from Honorary Membership, and shall not thereafter be included in any printed list of membership, Active or Honorary, unless he shall first have satisfied the reasonable objections of all parties aggrieved.

## SECTION 13.

### PENALTY FOR NON-PAYMENT OF ANNUAL DUES.

If any member shall neglect or refuse to pay the dues provided by the Constitution and By-Laws of this Association within sixty days after due notice by the secretary, he shall cease to be a member of this Association, and the secretary may strike his name from the rolls.

## SECTION 14.

### MEMBER'S LIABILITY TO SUSPENSION.

Any member of this Association who shall habitually fail to meet his obligations with the Wholesale Dealers and shall be reported by any dealer to the secretary of this Association shall be cited to appear before the Executive Board, and should he fail to exonerate himself from the charges preferred, to the satisfaction of the Executive Board, he shall no longer be considered a member of this Association and a participant in its benefits. When a member is dropped from this Association for non-payment of debts, the shippers who are honorary members of this Association shall be notified monthly by the secretary

## RESOLUTIONS.

The following resolutions were adopted at the semi-annual meeting, held in Milwaukee, Wis., Dec. 14, 1899:

Resolved, that the Executive Board of the Retail Coal Dealers' Association of Illinois and Wisconsin be instructed and they are hereby authorized to amend the Constitution and By-Laws of said Association, so that shipment to railroad companies, where the coal is used for other purposes than operating their lines, or conducting their business of railroading, shall be considered as shipments to consumers.

Whereas, Considerable trouble and many disputes have arisen on account of shipments being made to parties claiming they were going into the coal business, before such parties had properly equipped themselves as regular dealers, as

provided in the Constitution and By-Laws of the Retail Coal Dealers' Association of Illinois and Wisconsin; therefore be it

Resolved, That shipments to parties claiming that they are going into the business shall be considered as shipments to consumers, if such shipments are made before said parties have the proper equipment, as provided by the rules of the Association.

Resolved, That the Executive Board of the Retail Coal Dealers' Association of Illinois and Wisconsin be instructed and they are hereby authorized to employ a competent attorney as counselor for the Association, and that such attorney's name appear with the list of officers of said Association.

Resolved, That the Executive Board of the Retail Coal Dealers' Association of Illinois and Wisconsin be instructed and they are hereby authorized to change or amend the constitution and by-laws of said Association whenever they have reason to believe that they conflict with the laws of the State of Illinois or Wisconsin.

The pamphlet containing the constitution and by-laws contains this notice:

## "NOTICE.

Shippers are urged to refrain from quoting prices or sending circulars and price lists to consumers in towns in which members of this Association are located."

The statement further recites:

"That previous to the adoption of the resolution which authorizes the executive board to change or amend the constitution and by-laws whenever they have reason to believe that they conflict with the laws of the State of Illinois or the State of Wisconsin, the association was advised by a reputable attorney that the constitution and by-laws, as hereinbefore set forth, was not in conflict with the laws of the State of Illinois or of Wisconsin and that it was not an illegal act for this association to transact business under such constitution and by-laws, which advice the defendants believed and followed in the doing of the acts complained of."

"That in practice under Section 11 of said by-laws no mine operator, wholesale shipper, jobber, or their agents, has ever been expelled or dropped from the honorary list of membership, and objections have been satisfied either by payment of fines, as provided in the by-laws, or by agreement not to repeat the offense complained of."

"It was not deemed a reasonable objection thereunder to a sale to the consumer, as defined in said constitution and by-laws, if the regular dealer or dealers, as defined therein, doing business at the point of sale, failed to meet his or their financial obligations to the shipper, etc.; or if the wholesaler or shipper, etc., did not know at the time of the sale that the purchaser was not a regular dealer, as aforesaid."

"No compulsion or coercion was exercised by said association over the members thereof to induce them to comply with said constitution and by-laws otherwise than provided therein, if they may be so construed, but each member complied or not with said provisions as he considered his own best interests to dictate."

"The association did not attempt to regulate or fix the price of coal, but, on the contrary, the members of the association were at full liberty to charge whatever price they saw fit."

"Said association never compelled mine operators, wholesale shippers or jobbers or their agents, to violate any contract which they might have already entered into for the sale of coal."

"Penalties were considered as compensation to the retail member or members of the association located at the point where such so-called irregular sale was made, so as to assist such injured member or members to maintain the equipment required in the constitution, and to compensate them for loss occasioned them by sale from the shipper, etc., direct to the consumer."

"Experience in the retail coal business in Illinois and Wisconsin for many years has shown that the cost of handling coal by retailers who are regularly and continuously engaged in the business, is, on the average, over fifty cents per ton; and that fifty cents per ton on anthracite coal and twenty-five cents per

ton on bituminous coal, smithing coal or coke, is no more than a fair, reasonable profit to such average retail dealer for doing the business."

"That the establishment of said association has resulted in some instances in enabling regular retail coal dealers to establish places of business in some localities where before this association was established no retailer could afford to maintain a place of business, so as to keep a supply of coal constantly on hand all the year round to meet the demands of the public; and before the establishment of such retail dealer at such point, the public at such place were compelled to get their supply of coal from distant and inconvenient points at increased expense, or else purchase their coal directly from mine operators, and wholesale shippers or jobbers in carload lots (which contain from twenty to forty tons of coal per car), or else purchase of scalpers, who would not have a yard or other facilities for keeping a constant supply of coal on hand, but who would occasionally buy one or more carloads of coal, at such times in the year when it could be immediately retailed to consumers."

"A scalper, as understood by said association, is a person who does not have an office, scales, or a place for storing coal, nor does he engage regularly and continuously in the coal business, so as to supply the demands of the public at all times during the year; but on the contrary, a scalper is one who is in the habit of buying one or more carloads of coal, principally in the summer and fall when coal is at a low figure, and then selling it to consumers directly off the car."

"Protection to members of the association was sought to be given by imposition of the penalties prescribed in said by-laws, on offending members."

"The secretary of the association has sent out every three months, or caused to be sent out, a list of the honorary members of the association to the active members thereof; but neither said association, nor the secretary thereof, has since this constitution was adopted ever sent out, posted or distributed any warning, request or notice to the members of said association, or to anyone else, that any mine operator,

wholesale shipper, jobber or any of their agents, whether members of said association or not, should not be dealt with or patronized, or that purchases of coal should not be made of them."

"The executive committee usually convened only twice a year, once just before the annual meeting and once just after."

"Either active or honorary members could withdraw from said association whenever they pleased; and the non-payment of dues effected a termination of membership in the association."

"The term 'legitimate territory' referred to in Article 3, Section 5, of said constitution was understood by the members of said association to include territory naturally tributary thereto through location and lines of travel, but not to include any other city, town or village, where a member of said association was operating a yard and office, except in those instances where a member's place of business outside of said city, town or village was more accessible by the regular and natural route of travel than places of business in such cities, towns or villages.

"But if there were several members or eligible members of said association doing business in the same city, village, town or locality, it was understood that the legitimate territory of each included the whole of said city, village, town or locality, and any member was permitted to establish and operate as many places of business as he desired."

"That on the date of the indictment the members of said association consisted of 424 active members in the State of Illinois, 322 active members in the State of Wisconsin and 70 honorary members. That at said date there were over 1,950 persons engaged in the retail coal business in the State of Illinois and over 325 persons engaged in the retail coal business in the State of Wisconsin, who were eligible to membership in said association but were not members thereof. It is estimated there is sold in Illinois and Wisconsin each year on the average about 25,000,000 tons of coal, of which the railroads consume about one-half, and there is sold in said

states through the retail dealers who were members of said association about ten per cent of this amount, viz: 2,500,000 tons, about one-third of which is anthracite coal. The honorary members of said association did not include all the mine operators, wholesale dealers and jobbers who sold coal in Illinois and Wisconsin—the entire number being 250. But said 70 members were the principal and largest of said operators, etc."

"That on November 5, 1902, the following letter was sent out from the headquarters of said association in Cook County aforesaid, by its secretary, the defendant F. E. Lukens, addressed to one of the honorary members of said association, being a wholesale dealer in coal in the City of Chicago aforesaid, to wit:

## "RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN.

### 1536 Monadnock Block,

### Chicago.

Telephone Harrison 588.

(Omitting names of the officers and Executive Board, which appear on the letter heads.)

Chicago, November 5, 1902.   No. 81.

Gentlemen:—

We have six members of our Association living in and doing business at South Chicago. We are informed that you are supplying the Illinois Steel Company with soft coal for manufacturing purposes. We are further informed that the Illinois Steel Company are furnishing a part of this coal to their employes and others. We wish to advise you that this is against the rules of our Association, and such shipments are irregular after the mine operator has been duly notified, unless the manufacturer ceases to divert the coal for domestic use. There is no question but what the sale of this coal by the Illinois Steel Company is greatly injuring and demoralizing the trade in South Chicago. You may not know perhaps that they have been disposing of the coal in this manner, but

now that you have the information, we hope you will take immediate steps to relieve the situation, which is becoming almost intolerable to the retail dealers in South Chicago.

Kindly let us hear from you at your earliest convenience with reference to the matter, and greatly oblige

Yours very truly,

F. E. Lukens, Secretary."

"That on January 9, 1903, the following letter was sent out from the headquarters of said association by said secretary thereof, addressed to the same honorary member, as aforesaid, to wit:

(Letter head, name of association and officers and executive board the same as on first letter.)

"Chicago, Jan. 9, 1903.

Gentlemen:—

We have a complaint from Watseka, Illinois, in which it is claimed that Martin & Sweeney, Tile Mfgrs., have bought coal from you and are distributing same to private parties, which is against the rules of the Association.

We are also advised that the City of Watseka have bought coal from you, which they have distributed to private consumers, and we would like to hear from you with reference to this matter, and oblige

Yours very truly,

F. E. Lukens, Secretary."

"That the following circulars were sent out from the headquarters of said retail dealers' association in Chicago aforesaid, by its secretary, at the time of their respective dates, to the honorary members of said association, and to no others, to wit:

(Part of said circulars omitted for brevity.)

(Letter head, name of association and officers and executive board the same as on first letter.)

"May 29th, 1901.

The following parties are reported as being in the market for coal, and that they are not regular coal dealers at the points named, according to the rules of the Association:

Sanford v. People.

ILLINOIS.

ALGONQUIN.

The Borden Condensed Milk Co.,

Hard coal for employes.

FREEPORT.

The Stover Mfg. Co.,

Hard coal for employes.

LANARK.

E. C. Harpold, of Chicago, ✳

For hard coal.

Runs small electric light plant at Lanark.

Several farmers near Lanark.

Kindly keep this information on file for future reference.

Yours very truly,

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN."

(Letter head, name of association and officers and executive board the same as on first letter.)

"June 6, 1901.

The following parties are reported as being in the market for coal, and it is claimed that they are not regular coal dealers at the points named, according to the rules of the association.

ILLINOIS.

WAYNE.

W. S., J. B. and B. Dunham,

Proprietors of the Oak Lawn Farm.

QUINCY.

Knollenberg & Wavering.

Kindly keep this information on file for future reference.

Yours very truly,

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN."

(Letter head, name of association and officers and executive board the same as on first letter.)

"June 6, 1901.

The following parties are reported as being in the market for coal, and it is plain that they are not regular coal dealers at the points named, according to the rules of the Association:

## ILLINOIS.

ROCK FALLS AND STERLING.

Will Long.

Keystone Mfg. Co.

HINSDALE.

John Pitts.

STREATOR.

Thad. Russell.

## WISCONSIN.

REEDSBURG.

W. A. Stolte.

NEENAH.

Frank Leavens.

Henry Northrup.

MENASHA.

Frank Leavens.

Henry Northrup.

Kindly keep this information on file for future reference.

Yours very truly,

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN."

(Letter head, name of association and officers and executive board the same as on first letter.)

"July 1, 1901.

The following parties are reported as being in the market for coal, and it is claimed that they are not regular coal dealers according to the rules of the Association:

## ILLINOIS.

HENRY.

J. W. Watercott & Co.

Duke Bros.

DANVILLE.
   T. Conron.
   Ed Winters.
   Dewitt Frazier.
   Frank Lindley.
   T. J. Donley.
   Chas. Peiwell.
   J. W. Kent.
WHEATON.
   W. Lamont Odett.

### WISCONSIN.

APPLETON.
   D. W. Barry.

RIPON.
   J. A. Eggleston.

Note 1.    That Thad. Russell, of Streator, Ill., makes the statement that he has complied with all the rules of the Association as regards equipment, etc., in which event he will be considered as a regular coal dealer.

Yours very truly,

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN."

LEMONT.
   A. O'Shaughnessy.
      Is not a resident of Lemont; cannot be considered a dealer according to the rules of the Association.
RIDGEFIELD.
   F. W. Hartman.

### WISCONSIN.

VIROQUA.
   Nustad Bros.
   Vernon County Lumber & Mfg. Co.
      Are not entitled to quotations as manufacturers, as they use a gasoline engine.

Kindly keep this information for future reference, and oblige

Yours truly,

Retail Coal Dealers' Association of Illinois and Wisconsin."

"That in the month of April, 1902, the secretary of said association sent out from the office thereof in the county aforesaid, to its honorary members in and out of Cook County, and only to them, a pamphlet called a 'look-out list,' on the cover of which pamphlet was printed the names of the then acting officers of said association, being the same parties named in the indictment herein so far as their names are the same, a copy of which pamphlet is hereto annexed, and is the only pamphlet of the kind ever sent out, and is as follows, to wit:

The pamphlet referred to has on the first page of its cover the following:

"Look-out List

RETAIL COAL DEALERS' ASSOCIATION

of

ILLINOIS AND WISCONSIN.

Monadnock Block,

CHICAGO."

On the inside of the first page of the cover is the following:
"To Our Wholesale Friends:

"The 'Look-Out' List contains the names of persons who are not regular dealers in coal according to the rules of eligibility of our Association, and are not entitled to buy at wholesale under the rules of the trade, but who may seek to buy coal in car lots at towns where our members are located, and sales made to them will cause an injury to our members and may result in trouble for the shipper. Our wholesale friends are requested to keep this list constantly before them, as it will be a guide and guard against irregular shipments, and we solicit your co-operation to the end that the coal business

Sanford v. People.

may be mutually profitable in the territory of our organization.

"In considering our own interests we would not forget the interests of our brothers, the mine-operators and wholesalers, and it is our ambition to do all that is possible to the end that every coal dealer, be he shipper or retailer, may realize a reasonable return for his investment.

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN.

(Extra copies furnished upon application.)"

Then follows in thirty-two pages an alphabetical list of towns and cities in Illinois and Wisconsin, together with the names of certain individuals and firms at each place.

The list is headed, "Look-Out List."

Following this list of names on page 33 of the pamphlet is the following:

"To our Wholesale Friends:

"Following is a list of manufacturers who under the rules of our Association are entitled to purchase coal at wholesale for manufacturing purposes only; however, shipments made to manufacturers, where the coal is resold or furnished to their employes or others for domestic use, will be considered as irregular and the original shipper will be held responsible according to the rules of the Association. If contracts made for coal with manufacturers contained a provision that such coal is not to be resold or used for domestic purposes, the desired result would no doubt be accomplished.

RETAIL COAL DEALERS' ASSOCIATION OF ILLINOIS AND WISCONSIN."

After this is a list headed "Look-Out List Manufacturers" in Illinois and Wisconsin, containing ten pages, arranged alphabetically.

The last page of the pamphlet is as follows:

"RETAIL COAL DEALERS' ASSOCIATION
OF ILLINOIS AND WISCONSIN.
1536 Monadnock Block,
Chicago.
Telephone Harrison 588.
—o—o—o—
OFFICERS:
President, R. C. Brown, Oshkosh, Wis.
Vice-President, W. M. Sanford, Freeport, Ill.
Secretary, Frank E. Lukens, Chicago.
Treasurer, Joseph Vial, LaGrange, Ill.
Attorney, Samuel W. Packard, Chicago.
EXECUTIVE BOARD.
E. H. Keeler, Rockford, Ill.
F. M. Durkee, Lake Geneva, Wis.
Jno. W. Adams, Peoria, Ill.
C. L. Marston, Appleton, Wis.
Frank McGrew, Kankakee, Ill."

The agreed statement of facts then proceeds as follows:

"That the said defendants and each of them claim and in-
sist that a conviction of them, or either of them, under any
one of the several counts of said indictment, would deprive
them of a right, privilege or immunity guaranteed to them
under the Fourteenth Amendment to the Constitution of the
United States, and that they each claim and insist that they
are entitled to protection in the doing of the acts complained
of in the said several counts of said indictment under the pro-
visions of Section 1 of said Fourteenth Amendment to the
Constitution of the United States; and that the statutes re-
ferred to in the several counts of said indictment, and each of
them, are unconstitutional and void, and contrary to the Con-
stitution of the State of Illinois and to said Section 1 of the
Fourteenth Amendment of the Constitution of the United
States; and especially that the act of the legislature of Illinois
entitled, 'An Act to provide for the punishment of persons,
copartnerships or corporations forming pools, trusts and com-

bines, and mode of procedure and rules of evidence in such cases, approved June 11, 1891, and in force July 1, 1891, and as amended by an act approved June 20, 1893, in force July 1, 1893, and as further amended by an act approved June 10, 1897, and in force July 1, 1897, is contrary to the Constitution of the State of Illinois, and to the first section of the Fourteenth Amendment of the Constitution of the United States, and that Section 46, Chapter 38, Division I, of the Revised Statutes of the State of Illinois, Hurd's Edition, 1901, is contrary to the Constitution of the State of Illinois, and to the said first section of the Fourteenth Amendment of the Constitution of the United States."

Then follows a copy of the report made by the special grand jury which found the said indictment above referred to against the said defendants. The jury returned a verdict finding each of the defendants "guilty of conspiracy in manner and form as charged in the indictment and we fix the punishment of each of said defendants at a fine of $100." Motions for a new trial and in arrest of judgment were overruled and each of the defendants was sentenced to pay a fine of $100 and costs.

SAMUEL WARE PACKARD and DE FOREST M. NEICE, for plaintiffs in error.

CHARLES S. DENEEN, State's Attorney, and A. C. BARNES, Assistant State's Attorney, for defendant in error.

MR. JUSTICE FREEMAN delivered the opinion of the court.

It is contended that "the formation of this Retail Coal Dealers' Association for the mutual benefit and protection of its members was not 'an illegal act,' much less a criminal conspiracy"; that "the protection of the established local dealers and merchants in any locality from competition with 'scalpers' and peddlers or those who have no permanent established place of business and who do not therefore pay rent and taxes for local privileges is not opposed to sound public policy; that the constitution of the association "imposes only a par-

tial and reasonable restraint upon the business of its members"; that the members "had a legal right for their own mutual protection" to agree together not to buy coal of wholesalers who made it a practice to sell to those in competition with them; that threats not to deal with such wholesalers "are not coercive in the sense of being illegal or wrongful"; that "even if the combination or agreement was of such a character that it was void or non-enforceable on grounds of public policy, yet that does not establish that the combination or agreement was an 'illegal act' or a criminal conspiracy at common law"; that "the expression 'an illegal act injurious to public trade' when used to define a criminal conspiracy at common law, was understood to mean something more than an act that was simply void or non-enforceable because injurious to public trade; and therefore this expression in the statute of 1874 must be construed in harmony with this well known common law construction"; that "it is essential to constitute the crime of criminal conspiracy that in the doing of the act complained of the parties be actuated by criminal intent," and that no such intent existed in this case; that "the Act of 1891 was designed expressly to provide for the punishment of all persons who become parties to 'pools, trusts and combines,'" and that this "operated to repeal so much of the general Criminal Conspiracy Statute of 1874 as provided for the punishment of parties who conspired to do an illegal act injurious to the public trade in becoming parties to a 'pool, trust or combine.'" (R. S. p. 639-640, Sec. 269 a, Act of 1891.) It is further claimed that certain counts of the indictment are bad in failing to charge a criminal offense and for the alleged reason that "the General Conspiracy Statute of 1874 embraced and superseded all common law offenses (if any existed) for conspiring to do any 'act injurious to the public trade.'"

The contention that the Act of 1891 operated to repeal a part of the criminal code under which certain counts of the indictment were framed is disposed of by the recent decision of the Supreme Court in the case Chicago, Wilmington and Vermilion Coal Company et al. v. The People, 214 Ill., 421,

page 445, in which it is held that there is "no repugnancy between the enactments." In the same opinion (p. 444) that court also disposes of the contention that certain sections of the criminal code superseded or repealed all common-law offenses in relation to the regulation and fixing of prices and conspiring to do acts injurious to the public trade, and holds "that the common-law offense of conspiracy was not abolished by such statute, but that every conspiracy which was indictable at common law before the passage of the Act was still indictable."

The object and purposes of the Retail Coal Dealers' Association, and its methods, are sufficiently apparent from its constitution and by-laws and the conceded facts. It clearly enough appears that it is a combination, the tendency and manifest intention of which are to prevent general competition and so to control the retail coal trade and enable its members to control prices. Its object is stated in the first Article of its Constitution to be to prevent wholesalers from shipping coal direct to the consumer and small dealer; in other words, to compel such persons to pay tribute to those whom it defines as "regular coal dealers." To constitute such regular dealer and entitle him to membership in the Association he must possess a certain amount of capital, must own or lease a coal yard, keep a set of scales, an office open continuously during business hours involving employment of additional help, must have storage capacity for one or more cars of coal, etc. To all others the wholesaler is forbidden to sell coal. Doubtless there are members of the Association who have themselves risen from small beginnings. They are seeking now to shut the door of opportunity to others who may wish to follow in their steps, to destroy the ladder upon which they have climbed in order to create a monopoly for themselves. Mine operators, wholesale shippers and jobbers who wish to market their coal may become honorary members of the Association. If they do not become such members, however, the result so far as the business of members of the Association is concerned is not left open to conjecture. The members of the Association pledge themselves "to purchase goods of only

those" wholesale dealers "who recognize the principles of this organization," and sell their coal "only through the legitimate channels of the trade." It is sufficiently evident that these channels are intended to run only through the pockets of those whom this Association dubs "regular dealers." Any honorary member who sells coal to any person not a regular dealer is required to pay a penalty of fifty cents a ton for anthracite and twenty-five for bituminous coal, eighty per cent. of which goes to the "regular dealer" at the point of sale. If the sale is made to a consumer in any town where there is a member of the Association the wholesale dealer *ipso facto* withdraws from the Association and loses the business of all its members. Complaints of all kinds go to the Executive Board and their decision is binding upon all members, honorary or regular. Power is given such Board to suspend or expel any member and there is no appeal. Thus the business of dealing in coal, wholesale and retail, in the States of Illinois and Wisconsin is placed at the mercy of an Executive Board, four members of which constitute a quorum at any meeting. It is argued that to protect "regular dealers" who pay rent and taxes, from competition with those "who do not pay rent and taxes for local privileges," is not opposed to sound public policy. The legislation which protects established merchants from the unfair competition of itinerant peddlers and the public from their impositions rests upon a different basis from combinations in restraint of trade. It has never so far as we are advised been recognized as sound public policy to protect those who are able to pay more rent or taxes against legitimate competition in business of those who may be unfortunately unable to pay as much or any rent or possess as much or any taxable property. It may not in these days be an entirely novel view of sound public policy that combinations, the purpose and tendency of which are to make the rich richer and prevent the poor from bettering their condition, should be encouraged or at least not interfered with; but those who take such view are generally regarded as influenced by selfish considerations rather than by any conspicuous hunger and thirst after civic

righteousness or the public good. Sound public policy refuses to tolerate such combinations and regards them as conspiracies against the general welfare. The law regards them as unlawful and treats them as common law offenses. In People v. North River Sugar Refining Co., 2 L. P. A., 33, referred to in C. W. & V. Coal Co. v. The People, 214 Ill., 421, on p. 442, the Supreme Court of New York said "all the cases, ancient and modern, agree that a combination the tendency of which is to prevent general competition and to control prices is detrimental to the public and consequently unlawful."

It is argued that the constitution of the Association imposes only a partial and reasonable restraint upon the business of its members, that there was not a total restraint of trade, but only partial and in the interest of the "regular dealer," that even without any established place of business one could engage in the coal business by paying on the coal he handled fifty cents a ton for hard coal and twenty-five cents a ton for soft coal to the regularly established local dealer to enable such dealer to maintain his place of business all the year around, that "this payment to the established local dealer removed all restrictions on competition," and that by withdrawing from the Association he could "remove all restraint upon himself whatsoever." In other words a dealer, wholesale or retail, can graciously be permitted to do business if he can, although contrary to the rules of this Association, provided he will pay a ruinous tribute to one of its members who is a so-called "regular dealer." By what right, legal or moral, this Association assumes to thus levy tribute we are not advised. As said by Judge Horton in disposing of the case in the Criminal Court, "What legal or vested right have the members of said Association to the patronage of all the consumers of coal in any particular place or locality?" The argument that this combination exercised only a partial and reasonable restraint over trade is scarcely tenable. If it was, nevertheless it is not necessary that it should create a monopoly. It is sufficient if it tends to that end and to interfere with free competition. U. S. v. Knight, 156 U. S., 1. It is, we

think, clear that such a combination as that under considera-
tion between wholesale and retail dealers and producers of
coal, a necessity of life, "is an act inimical to trade and com-
merce and detrimental to the public and unlawful, and
amounts to a common law conspiracy regardless of what may
be done in furtherance of the conspiracy." Such conspiracy
to do an unlawful act is indictable at common law, even
though the act itself may not be punishable as a crime. C.,
W. & V. Coal Co. v. The People, 214 Ill., 421-441, et seq.,
and cases there cited.

The case last cited disposes of most of the contentions of
counsel for appellants in the case at bar, and renders it
unnecessary for us to review them at length. To do so and
consider in detail the views of counsel expressed in elaborate
arguments covering several hundred pages would serve no
good purpose. The ultimate object of the combination was to
give to its members a monopoly in the retail coal business
in their respective localities, thus enabling them to regulate
prices independent of legitimate and healthful competition.
We are of opinion that the verdict and judgment are amply
justified by the evidence and the law applicable.

The judgment of the Criminal Court will therefore be
affirmed.

*Affirmed.*