## LANE v. LEITER.

## INTERIOR ELEVATOR CO. v. LEITER.

(Circuit Court of Appeals, Seventh Circuit. May 26, 1916.)

### Nos. 2245, 2246.

1. MONOPOLIES ⊜⇒17(1)—CONTRACTS IN "RESTRAINT OF TRADE"—"ATTEMPT TO CORNER GRAIN MARKET"—"COMBINATION TO MONOPOLIZE FOOD PRODUCTS" —"RESTRICT THE FREEDOM OF MARKETS."

An agreement between the owners of large quantities of wheat to hold the same together and sell in the market only by agreement between themselves is illegal, under Hurd's Rev. St. Ill. 1915–16, c. 38, § 130, which declares the making of a contract for cornering or attempting to corner the market in relation to grain a criminal offense, and the contract void, and likewise under Const. Minn. art. 4, § 35, and Laws Minn. 1891, c. 10, § 1, which condemn contracts to monopolize food products or restrict the

freedom of such markets. Such contracts are also void at common law, as in restraint of trade and against public policy.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. ☞17(1).

For other definitions, see Words and Phrases, First and Second Series, Restraint of Trade.]

2. MONOPOLIES ☞21—VALIDITY OF NOTES—ILLEGAL CONSIDERATION.

Defendant and two others, each the owner of a large quantity of wheat in store in the spring, entered into a pooling agreement to hold their wheat together for the purpose of controlling the market and forcing up the price. If either wished to sell any part of his holdings, he was to first offer it to the other parties. After the price had advanced, one of the other parties desiring to sell 920,000 bushels, defendant bought it under the agreement, to be still held subject thereto, agreeing to pay about 40 cents a bushel above what was the market price when the agreement was made. He made payments of something more than such former market price, and gave two notes for the remainder of the agreed price. *Held,* that the notes, the only consideration for which was the profit made by the seller as a direct result of the illegal agreement, were invalid, and not collectible in his hands.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 15; Dec. Dig. ☞21.]

3. MONOPOLIES ☞21—VALIDITY OF NOTES—ILLEGAL CONSIDERATION.

The fact that at the seller's request defendant made the notes payable, respectively, to two elevator companies, in whose elevators the wheat was stored and held, did not charge him with knowledge or establish as a fact that such companies were the owners of the wheat and the principals in the sale; it appearing that the elevators were public warehouses, and that the seller was the president and majority stockholder and controlled the business of both, and that other officers of the companies had knowledge that throughout the transaction and in the sale he had represented and treated the wheat as his own property.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 15; Dec. Dig. ☞21.]

4. MONOPOLIES ☞23—SALE—VALIDITY OF CONTRACT.

A contract by an owner to sell wheat is not invalid, because he had knowledge that it was to be used in fulfillment of an agreement which was illegal, as in restraint of trade, where he was not a party to such agreement.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 16; Dec. Dig. ☞23.]

5. PRINCIPAL AND AGENT ☞143(2)—UNDISCLOSED AGENCY—RIGHTS OF UNDISCLOSED PRINCIPAL.

The fact that a party, in making a contract, acts for an undisclosed principal, does not enlarge the rights of the principal over his own as against the other party, nor deprive the latter of any defense which he would have had against the agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 503, 506, 507, 511, 512; Dec. Dig. ☞143(2).]

6. APPEAL AND ERROR ☞230, 259—REVIEW—CONDUCT OF TRIAL.

Remarks made by the court in the presence of the jury are not subject to review by an appellate court, where no objection was made, nor exception taken at the time.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1499; Dec. Dig. ☞230, 259.]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Actions at law by Chester W. Lane and by the Interior Elevator Company against Joseph Leiter. Judgment for defendant, and plaintiffs bring error. Affirmed.

These actions, commenced September 30, 1911, arise out of the same transactions and were tried together. The first was on a note for $58,034.92, made to Monarch Elevator Company, indorsed to plaintiff in error, an officer of payee, who took title merely for convenience, and does not claim to be a holder in due course. The other was on a note for $199,355.79, to plaintiff in error Interior Elevator Company. Both notes are dated Chicago, October 6, 1898, due on or before 3 years from their date, with interest at 3 per cent. per annum, and signed by defendant in error. Nothing of principal or interest has been paid. The defense is that the notes grew out of an alleged undertaking or conspiracy entered into between Frank H. Peavey, and Charles A. Pillsbury, both of Minneapolis, and Joseph Leiter, of Chicago, defendant in error, to corner the wheat market, and are void under the common law, as well as under section 130, c. 38, Revised Statutes of Illinois, which denounces as criminal the making of option contracts for grain, or the cornering or attempting to corner the market in relation to grain, and declares all contracts made in violation of the section to be gambling contracts and void, and that they are likewise void under article 4, § 35, of the Minnesota Constitution, and chapter 10, § 1, Gen. Laws Minn., in force in 1898, which condemn combinations or agreements to monopolize food products, or to interfere with or restrict the freedom of such markets. The jury found for defendant, and the District Court rendered judgments accordingly. In the opinion following further facts are stated.

Dwight S. Bobb and James B. Wescott, both of Chicago, Ill., for plaintiffs in error.

Henry Russell Platt, of Chicago, Ill., for defendant in error.

Before MACK and ALSCHULER, Circuit Judges, and SANBORN, District Judge.

ALSCHULER, Circuit Judge (after stating the facts as above). In the forepart of April, 1898, Peavey, Pillsbury, and Leiter were each large operators in and holders of wheat. Under date of April 14th Pillsbury wrote Leiter saying:

"Peavey has about a million and a half of contract wheat in his own houses and he has 600,000 or 700,000 warehouse receipts in other elevators. Indeed, if you do not get your wheat all sold by May 1st I think this market could be absolutely controlled and cash wheat put to about any premium we wanted, if you, Mr. Peavey, and myself all worked together; but the arrangement might have to be made before the first of May."

In a letter of April 18th he suggested Leiter and himself taking a certain amount of Peavey's wheat, and proceeded:

"Now when this is done Mr. Peavey will have about a million and a half bushels of wheat left in Minneapolis and quite a little bunch in Duluth. He will agree to work with us to control the cash wheat market and will see that none of his wheat is shipped to Chicago. In a general way Mr. Peavey and I have controlled this market several times in this way; we put our wheat together, in a bunch, then we fix a price at what we want to sell it, and each one sells wheat in proportion to the amount he holds. In case one man wants to sell and the others do not, the other two have the privilege of buying the wheat from him or letting him sell. I should think this would be a good arrangement for us to make all around, and then a very little after the first of May we can regulate the premium on cash wheat here, all we want to."

On the 19th Leiter wrote Pillsbury, saying he had lunched with Peavey and that they agreed on the proposition as outlined in Pills-

bury's letter, and that no wheat belonging to either party to the arrangement should come to Chicago for sale, whether to be sold on joint account or account of any individual who may sell. Under same date Pillsbury wrote Leiter, going into further details, and saying:

"I think if we can control all the cash wheat in the Northwest we can make foreigners and home millers pay about what we are a mind to ask for the stuff."

On the 24th, Pillsbury, Peavey, Leiter, Thompson, from Duluth, a special partner of Pillsbury, and French, of Chicago, a friend of Leiter, met at Pillsbury's office in Minneapolis. The details of the business were talked over, and the letters which had passed between Pillsbury and Leiter were submitted. It was agreed that the three (Pillsbury, Peavey, and Leiter) enter into the arrangement substantially as indicated by the letters; that Peavey and Pillsbury should handle the Minneapolis end of the pool or corner, Thompson attend to affairs at Duluth, and Leiter look after the Chicago end; and that no member of the pool should sell any of his holdings until he offered them to other members of the pool; but, if they refused to buy he might sell as he saw fit, except that no part of the Northwestern wheat should in any event be sold on the Chicago market.

Leiter wanted a written agreement, but Pillsbury and Peavey refused, saying it was a criminal conspiracy, and that they would have to work under a "gentlemen's agreement." The record contains much more of similar import, but the references made sufficiently indicate the nature of the undertaking.

[1] Such agreements are void, not only under the statutes referred to, but also at common law, as being in restraint of trade, and against public policy. Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; Craft et al. v. McConoughy, 79 Ill. 346, 22 Am. Rep. 171; Samuels et al. v. Oliver et al., 130 Ill. 73, 22 N. E. 499; C. W. & V. Coal Co. v. People, 214 Ill. 421, 73 N. E. 770; Foss et al. v. Cummings et al., 149 Ill. 353, 36 N. E. 553. In the case last cited the court, holding the agreement void as an attempt to corner the market in violation of the statute, as well as being in restraint of trade and void at common law, quoted with approval the following language from 9 Am. & Eng. Ency. of Law 595:

"All compacts between merchants, speculators, or any class of men to elevate or depress the market are injurious to the public interest, and in restraint of trade. When such a purpose is apparent in a contract, it strikes the agreement with nullity. Such a combination of dealers is nothing less than a conspiracy against trade, entered into for selfish purposes, and tending to make the poor poorer and the rich richer. Whether the design is to bring the price of any commodity to a point below its value in a fair and open market, or to raise it above its true worth, the illegality of the combination is the same. Such design will not be furthered by the courts, though there may be circumstances under which the object of such a contract does not sufficiently appear to expose the illegality. If the true character is known, the contract will be held void."

[2] A part of the wheat which Peavey brought into this unlawful combine or corner consisted of 200,000 bushels then in the elevator of the Monarch Elevator Company and 705,000 then in the elevator of

the Interior Elevator Company, both at Minneapolis. It will be needless to detail the operations of the combine, but suffice to say under its influence the market price of wheat, which was about $1 when the combine was formed, rapidly and substantially rose. On May 9th Peavey desiring to realize on this 905,000 bushels came to Chicago, and under the pooling agreement offered it to Leiter, who after some parley contracted to take it at $1.45, Peavey to store it free till September 1st. This did not terminate nor dissolve the corner, nor end the participation in the pool or corner of this 905,000 bushels, but under the manipulation and control of these men the pool actively continued its operations, with the result that for a short time afterward wheat went as high as $1.75. But Leiter could not unload without breaking the market, and about the middle of June, finding himself unable longer to carry his vast holdings of wheat, a committee, consisting of Messrs. Peavey and Armour, was appointed to take over and dispose of the same for the benefit primarily of his creditors. This they did, ultimately selling all Leiter's wheat, including this 905,000 bushels, at about 85 cents. After the 905,000 bushels had been disposed of, it was found that the price realized, plus the very large amounts which from time to time Leiter had put up with Peavey as margins to carry this wheat, aggregated a sum which, deducted from the price of $1.45 per bushel, left a debit balance against Leiter on this purchase, amounting to the aggregate of these two notes, and constituting the only consideration for them.

The evidence warranted the jury in finding that it was in pursuance of the unlawful agreement to corner the market that Peavey sold and Leiter bought and held the 905,000 bushels, and that through the influence of the pool or corner by May 9th wheat had advanced in price about 40 cents over the price when the pool was formed, and that the entire consideration for the notes represented profits on the wheat to Leiter's vendor, and loss to Leiter, resulting directly from this unlawful attempt to corner the wheat market. In other words, if it may be assumed that but for the corner there would have been no substantial change in price between April 24th and May 9th, and that if Leiter, on the last date had undertaken to buy wheat on a market uninfluenced by the corner, he could have bought it at about 40 cents per bushel less than under the "gentlemen's agreement" he was practically compelled to pay (or contract to pay) to his partner in the very unlawful enterprise which enhanced the price. Selling at $1.45, the resultant profit by reason of the pool, on the 905,000 bushels at 40 cents would be $362,000, of which there remains unpaid $257,390.71, the aggregate of the notes, which thus represent profits arising directly out of what the law stamps a gambling transaction. If the action were by Peavey, clearly he could not recover; nor, indeed, is it contended in the briefs for plaintiffs in error that he could.

[3, 4] But plaintiffs in error contend that this wheat was the property of the Monarch and Interior Elevator Companies, respectively, and was by them sold to Leiter; that these companies had no participation in the unlawful conspiracy or attempt to corner the market; and that plaintiffs in error are therefore entitled to recover upon the notes.

If from the record these facts so conclusively and certainly appear that the jury ought not reasonably to have found otherwise, it is clear plaintiffs in error should prevail, even though the elevator companies may have had knowledge that the wheat would be used for the purposes of the unlawful combination. Armstrong v. American National Bank of Chicago, 133 U. S. 433, 10 Sup. Ct. 450, 33 L. Ed. 747; Jackson et al. v. City National Bank of Goshen, 125 Ind. 347, 25 N. E. 430, 9 L. R. A. 657; Willson v. Owen, 30 Mich. 474.

Who was the vendor of this wheat is thus of the very essence of the controversy. There is nothing in the record to show that prior to the purchase on May 9th Leiter had the slightest reason to believe any one but Peavey owned the wheat. From the inception of the corner, again and again, orally and in writing, Peavey referred to it and treated it as his own, and as such he brought it into the pool. Where it was stored was of no particular concern to Leiter. The fact that he then knew, if he did know, or that at the time of his purchase of it he knew it was in these elevators, would not of itself lead him to believe that the elevator companies owned the wheat. These were terminal elevators—public warehouses—licensed under the law, and having the duty to receive and store and hold as bailees, grain for all who may bring it to them, and to issue warehouse receipts in manifestation of the ownership. Gen. St. Minn. §§ 7659, 7646, 7649, 7650.

Although this wheat was in these elevators before the agreement to corner was made, the record does not disclose that the companies ever had the warehouse receipts. General Manager Stevens did not know who had them, but stated it may have been Peavey & Co., who may have held them as collateral for money advanced, the same as a bank might have held them. He said the companies had books which showed where the receipts were, but the books were not produced. Mr. Lane testified that these books having the records for 1898 could not be found and must have been destroyed. The receipts themselves, which must have been surrendered to the companies when the wheat was withdrawn from the elevators, remain also unaccounted for in the record. If the certificates were in Peavey's name, originally or by assignment, either as absolute owner or as security for advances, he had the indicia of title in himself to substantiate his asserted and apparent ownership. However, it does not appear that Leiter questioned his title, but that he took it for granted the wheat was Peavey's, and that Peavey had, as he assumed to have, the right to deal with it as his own. But the record discloses facts from which the jury was amply justified in concluding that these companies well knew and understood that Peavey was representing and handling the wheat as his own, and even in finding that to all practical intents and purposes the wheat was in fact Peavey's, and the companies only his agencies or instrumentalities in carrying and handling it.

All the extended correspondence and dealings with Leiter were conducted in the name of Peavey, or Peavey & Co., the two names being indiscriminately employed. E. M. Stevens, testifying for plaintiffs in error, said he was at these times the general manager and auditor of these companies, and auditor and employé of Peavey as well. Each of

them paid him. He had authority to sign the names of the companies, or of Peavey, or Peavey & Co., and did so as the nature of the business required. He appears to have signed Peavey's name to various letters in evidence which contain statements of Peavey's ownership inconsistent with title of the wheat in any one but Peavey. It would unduly tax credulity to say that Stevens was not entirely familiar with all the details of all these transactions. From his testimony it appears that Peavey was the directing and radiating center of a grain dealing "system" which bore his name, and of which these and other companies were a part, and which was known as the "Peavey System." All the business stationery of Peavey and the elevator companies bore on its face an emblem consisting of a red diamond with "P. V." printed on it to designate the user as a Peavey concern. The Peavey and the elevator offices were on the same floor. Peavey owned a majority of the stock of both companies, and with his family and partner held 84 per cent. of the Monarch and 89 per cent. of the Interior stock. He was president of both, and Stevens said he was the "dominant factor" and controlled the policies of all his companies, that he could have ordered out every bushel of wheat belonging to the houses, and that no one of the companies could have sold contrary to his orders. Witness Higgins, who was superintendent of the Monarch, and kept the records of grain received, also testifying for plaintiffs in error, said that he knew nothing about the ownership of wheat, except as Peavey's office sent word, and that the dealings with outside parties were in Peavey's hands.

But the transaction of sale and purchase is in itself of course of prime importance in determining who were the parties to it. The negotiations took place at Chicago. Peavey, asserting his desire and right under the "gentlemen's agreement" to sell the wheat, offered it to Leiter as the agreement required. They reached an understanding which they manifested by two letters dated May 9th at Chicago. One from Peavey to Leiter is as follows:

"Confirming our conversation this a. m., we sell you this day 905,000 bushels No. 1 Minneapolis wheat in store Minneapolis at $1.45 per bushel, you to margin it as required and pay interest and insurance; but you are to have free elevator storage until September 1st, at which time you will settle and pay us for whatever amount may be due us on above purchase."

Leiter's reply addressed to F. H. Peavey & Co., is as follows:

"Referring to your letter of even date, I beg to confirm your letter and our conversation of this morning. I bought from you this day 905,000 bushels of No. 1 Northern Minneapolis wheat in store Minneapolis at $1.45 per bushel, and I agree to margin as required and pay interest and insurance; but you are to furnish me free elevator storage until September 1st, at which time I will settle and pay you for whatever amount may be due you on above purchase."

This closed and constituted the contract of purchase and sale of this wheat, and to this contract it does not appear the elevator companies, so far as concerns Leiter, were directly or indirectly parties. In fulfilment of the contract, Peavey wrote Leiter from Minneapolis on May 12th:

"I inclose invoices of the 905,000 bushels of wheat you bought of me May 9th. They are sent in the regular form, so as to be properly on our books."

Then follow some comments with respect to the conduct and progress of their wheat corner, closing with the sentence, "I shall not let this market close below 10 cents under Duluth unless you advise to the contrary," and signed "Frank H. Peavey." The "invoices" inclosed with this letter, being the main reliance of plaintiffs in error to show a sale by the companies, are set out, as follows:

MONARCH ELEVATOR CO.

(PV)

Minneapolis, Minn. May 9th, 1898.

Joseph Leiter, Esqur.

Date of Sale ........... Chicago, Illinois.

| Car Number | Transferred To | Grade | Gross Weight | Dkg. Net. Weight | Price |
|---|---|---|---|---|---|
| | In Store | Mpls. 1° | 200000 | 145 | $290000 |
| JL | | | (208) | | Warr. |

Minneapolis, Minn. May 9, 1898.

M. Joseph Leiter,
　　Chicago.

Bought of the Interior Elevator Co.

(PV)

| Terminal Elevators | | 214 Flour Exchange | | Capacity 3,000,000 Bushels | |
|---|---|---|---|---|---|

| Sale No. | Car Init. | Gross Lbs. | Gross Bu. | Insp. | Net Dock Bu. | Price | Amount |
|---|---|---|---|---|---|---|---|
| Mpls. | Wheat in Store | | | 1° | 705,000.00 | 145 | 1022250.00 |
| (209) | | | | J.L. | | Warr. | |

This is the first instance where these corporate names appear in the transaction, and aside from the notes themselves is practically all the evidence the record affords to show that the wheat was sold to Leiter by these companies. The instruments were both dated back to May 9th, the date of sale, so that, as was explained, interest would run from that time—indicating that at the time the companies regarded the sale as having been made by what occurred between Leiter and Peavey on the 9th, and not by the sending of these invoices. The Monarch Company form does not purport to be a sale at all, in that no date is filled in the blank after the form words "Date of Sale." The Interior Company form recites that Leiter "bought of the Interior Elevator Company." It is urged that Leiter's concurrence in a sale to him by the companies appears from the fact that he initialed these papers. These papers, so initialed, were not sent to the companies to manifest to them his acceptance, but with the letter from Peavey transmitting them, remained in Leiter's possession. It appears that it was his custom to place his initials on all correspondence and papers that came under his observation, not by way of approval or ratification, but merely by way of identification of the paper as having

been examined by him, and this accounts for the same initials (J. L.) on many of the other papers in evidence. Peavey's statement in the letter that the invoices "are sent on the regular form, so as to be properly on our books," does not indicate that by inclosing the invoices it was designed to convey information that any one other than Peavey himself was the vendor of the wheat.

After May 9th the correspondence between Peavey and Leiter concerning the progress of their combine, and the status of this wheat purchase, actively continued; this wheat being invariably referred to as having been Peavey's, and as being now carried by him for Leiter. He made repeated calls on Leiter for further margins on this and much other wheat, to which Leiter responded by sending him from time to time in May and June large sums, aggregating over $300,000, on this wheat alone, although, as Stevens testified, the money was not paid over to the companies, nor does it appear on their books at all until October 6th, which is the date of the notes, when it shows for the first time as having been credited on the purchase price of the wheat.

On June 7th Peavey, signing by Stevens, wrote Leiter:

"We inclose you herewith interest statements for 905,000 cash sale which we have with you. 705,000 of which is on our books with our Interior Elevator Company and 200,000 with the Monarch Elevator Company. Interest has been charged on these statements to June 1st, and they will render you like statements at the end of each month. We do not charge insurance at this time, but same will follow in one item at the closing of the deal."

Interest statements by the elevator companies were inclosed, and others sent monthly till the deal was closed out. It is urged that this letter and the sending of the interest statements further manifest that the deal was between Leiter and plaintiffs in error; but to us it seems rather to emphasize the conclusion that the transaction was wholly between Peavey and Leiter, at least a finding of the jury to that effect would surely not be without evidence to sustain it.

Books and records were received in evidence to show that the wheat was in fact bought by the companies, and was their property. This may be admitted, yet it does not follow that the sale to Leiter was by them. For one to contract with another for the sale of a commodity, and to fulfill his contract by having a third person whose property it was make the delivery, is a very usual transaction. But this does not give the third party, who theretofore was the owner, any claim against the vendee, whose liability is to his vendor alone. Any relation or understanding between Peavey and these companies under which their wheat may have been used to fulfill Peavey's undertaking with Leiter, was really no affair of Leiter's, who was dealing with Peavey for wheat which Peavey either owned or had the apparent, if not the actual, right to dispose of as his own.

[5] It is suggested in briefs for plaintiffs in error that the relation of the companies to the transaction was that of Peavey's undisclosed principals; but this would not enlarge their right over Peavey's, nor deprive Leiter of any defense against them which he would have had

against Peavey. Tiffany on Agency, § 71; 2 Mechem on Agency (2d Ed.) § 2074, and cases there cited.

But it is insisted that the fact of·Leiter's giving the notes to the elevator companies, in connection with the other facts referred to, conclusively shows the contract to have been with the companies, and entitled them to an instructed verdict in their favor. The probative value of the fact of so giving the notes was for the jury to determine. From the uncontradicted testimony of witness Warr it appears that on October 6th Stevens presented at Leiter's office three statements showing debit balances of $58,034.92 on the 200,000 in the Monarch, $199,-355.79 on the 705,000 in the Interior, and $196,614.19 on other deals with Peavey; that shortly afterwards Peavey came in and asked Leiter to give a note for the amount due, but that when it came to make out the note he requested three notes, instead of one, each covering one of the amounts shown on these statements. The notes were so made, and each statement appears indorsed by Peavey "Received payment by note due October 6, 1901"—the first being signed, "Monarch Elevator Co., by F. H. Peavey, Pt.," the second, "Interior El. Co., by F. H. Peavey, Pt.," and the last "F. H. Peavey & Co."

There is no necessary significance in the fact of Leiter's giving the notes to the companies. If the "gentlemen's agreement" was then still of sufficient potency to induce him to give his note at all in settlement of this otherwise uncollectable balance, it is not unreasonable to conclude that he was willing to divide it into as many notes, made payable to such payees, as Peavey might request.

Counsel for plaintiffs in error are urgent in their insistence that serious error was committed by the court in charging the jury that if Peavey controlled and dominated the Monarch and Interior Companies, and was their actual managing officer, his knowledge of the illegality of the agreement with Leiter and Pillsbury would carry notice of such illegality to the companies. Many cases are cited to sustain the proposition that, where a corporate officer deals in his individual capacity with the corporation, his knowledge acquired in such transaction will not be attributed to the corporation. For defendant in error cases are cited to show that the rule does not apply where the officer has the absolute control and domination of the company's business. We need not consider the limitations or application of the rule, for not only would the companies have had such knowledge through Stevens, who does not appear to have had any personal interest in the transactions, but elsewhere in the charge the jury was told that knowledge of the company that the grain would be used in furtherance of a gambling transaction would not prevent recovery on the notes, unless accompanied by proof of the fact that the companies were interested in the illegal transaction, and that, if the contract of sale was between Leiter and the companies, then unless the companies were so interested they are entitled to recover. So, even if the part of the charge complained of is erroneous, plaintiffs in error sustained no harm through it.

[6] Complaint is made of certain remarks of the trial judge in the presence of the jury; but as the record does not show objection or exception to the remarks at the time the matter is not reviewable.

Drumm-Flato Commission Co. v. Edmisson, 208 U. S. 534, 28 Sup. Ct. 367, 52 L. Ed. 606; Robinson v. Van Hooser, 196 Fed. 620, 116 C. C. A. 294; I. C. R. R. Co. v. Griffin, 80 Fed. 278, 25 C. C. A. 413.

Peavey having died prior to the trial, reversal is urged for the error alleged in admitting Leiter's testimony of his conversations with Peavey, on the ground that Peavey was the agent of the elevator companies in the sale of the wheat, and that under section 4, c. 51, Rev. Stat. of Illinois, a party who contracted with an agent, since deceased, of the adverse party, may not testify to conversations had with the agent, unless the conversation was in the presence of a surviving agent of the adverse party. Without considering the applicability of the statute to a case such as this, where the very question in issue is whether or not deceased was in fact the agent or the principal, we find that the error, if any there was, in admitting the testimony, was not prejudicial to plaintiffs in error. Substantially all of it related to matters which were otherwise and without contradiction fully shown by other evidence of undoubted competency. The transaction of April 24th at Minneapolis was proved by witnesses Thompson and French, and the nature of it further abundantly appears from letters in evidence. The wheat purchase was fully shown by the letters of May 9th, and the conversation between Peavey and Leiter leading up to that deal (which does not vary the terms of these writings) was testified to by French; and witness Warr testified to the conversation at the time of giving the notes, and if he did not state the facts, Peavey's brother, who was also there present, might have been, but was not, called to testify.

We find no error which would warrant a reversal of these judgments, and they are affirmed.